[1] Reported in 212 P.2d 823.
This appeal has been taken by the executors and trustees appointed by Garrett W. O'Neil in his will from a decree adjudging it to be null and void and vacating a decree admitting it to probate. The will was executed by the testator October 11, 1947. He died March 31, 1948, being at the time of the age of eighty-two years.
The relevant parts of the will recite that he had been married to Maude E. O'Neil and that they were divorced in 1914. He declared that he had in mind his two children born to his former wife and himself. He stated he did not leave them, or their descendants, anything under the will and had intentionally made no provision for them and would make no further mention of them in his will. After making specific bequests in money and articles of personal property, he provided:
"All the rest, residue and remainder of my estate of whatsoever character and wheresoever situated, I give, devise and bequeath to my executors named Dr. Kenneth B. Edgers of Seattle, Washington, as chairman, Dr. Philip R. Fehlandt of Tacoma, Washington, and James P. Sanderson, as attorney, in trust, however, for the following uses and purposes: To buy or build a large house as near Ripon College campus as possible, or on the College property if permitted, to be known as the GARRETT WILLIAM O'NEIL HOME for the use of worthy boys who are unable to meet all their expenses while attending Ripon College, and limited to Protestant boys who do not smoke, drink intoxicating beverages or gamble. The said Home is to be conducted on the co-operative plan, with no cliques or clans, that a christian influence shall prevail, and supervised by the College President and the Board of Trustees of Ripon College, who shall assign the boys to the said O'Neil Home.
"I desire and direct that my executors cause all my books, furniture, pictures, rugs, and other household articles of appropriate use be packed and shipped to the said GARRETT WILLIAM O'NEIL HOME in Ripon, Wisconsin. The said books to be stamped `GARRETT W. O'NEIL, '97.' and kept in the said Home for use of the student occupants." *Page 327 
The will was contested by the daughters of the testator upon the grounds that he was lacking in testamentary capacity and entertained fixed and false delusions that Gwyneth Mondale was not his daughter, that she was and for many years had been a prostitute and a confirmed drunkard, and that Natalie Poolman had attempted to murder him by poison.
The court found from the evidence that, shortly after the year 1914, Garrett W. O'Neil began to suffer from a fixed insane delusion of persecution; that between February, 1931, and April, 1935, he began to entertain a fixed and irremovable belief and insane delusion that his daughter Natalie and her husband were trying to poison him; that his daughter Gwyneth had been a prostitute, in which her mother had aided and abetted, when she was from twelve to fourteen years of age; that the mental condition of the testator continued to deteriorate until on or about the first of the year 1947, when he entertained a fixed insane delusion (from which he could not persuade himself to believe otherwise) that his daughter Gwyneth was not his child and that she was a prostitute; that he also suffered from the insane delusions that the one who had been his trusted physician for many years had tried to convert him into a narcotic addict; that the nurses who were caring for him had tried to poison him; that others had tried to rob him after first putting him under the influence of narcotics; that while he was a patient in a hospital he had been beaten by the attendants; that all of the foregoing were insane delusions and that the testator had been unable to cure himself of them. The court further found and concluded that, but for such delusions on the part of the testator, his will would have been different, and because of such delusions concerning his daughters he was prevented from normally recollecting the natural objects of his bounty and therefore lacked testamentary capacity in that respect. The only conclusion of law which the court drew from the foregoing finding as to incompetency of the testator to make a will was
"That from on or about the first of the year 1947 Garrett W. O'Neil suffered from insane delusions concerning *Page 328 
his two daughters who were the natural objects of his bounty and that by reason thereof he was then and thereafter incompetent to make a will in so far as they were concerned; and that he died intestate."
Many witnesses testified with reference to things said and done by the testator over a period of time from 1914 to his death in 1948 indicating his habits, views and opinions, his mode of living, eccentricities and the kind of a person he appeared to be to them, which furnished the basis for the conclusion reached by the trial judge. It would extend this opinion to an undue length to make an analysis of the testimony and would serve no useful purpose, in view of the somewhat limited questions we have for review. All of the matters and things testified to by the witnesses relating to the testator are helpful in determining his state of mind at the time of making his will, and we have considered them in reaching our conclusions. The questions for our determination are whether the testator at the time he made his will entertained the fixed beliefs with which he is charged with reference to his daughters, that such beliefs constituted insane delusions, and that they materially affected his will.
[1] The respondents have moved to strike the statement of facts and dismiss the appeal upon the ground that it shows upon its face that it is not complete, in that the inventory and appraisement and other portions of the estate file stipulated to be a part of the record and a stipulation of chronological events are not contained therein.
We are in accord with the view of respondents that it is incumbent upon an appellant to file a statement of facts containing all matters and things necessary and proper for a review of the questions raised, and that, if a statement of facts shows on its face that it is incomplete, the certificate of the trial judge is not necessarily conclusive. We do not have such a situation before us. This proceeding was brought in and was entitled "In the Matter of the Estate of Garrett W. O'Neil, deceased," then in process of probate. During the progress of the trial, counsel for respondents requested and opposing counsel consented that it be stipulated *Page 329 
that the proceedings in the estate would be considered as a part of the record of the case on trial.
Near the conclusion of the trial, the court requested counsel to agree upon and present to him a stipulation of chronological events having a bearing upon the case to assist him in its consideration. Counsel complied with the request of the trial judge, and we are satisfied that it was the intention of both the court and counsel that it should become and be considered as a part of the record. This being the case, it assumed the same status as the probate file. The estate files, which included the inventory and appraisement and the stipulation, thus became a part of the record, and it was not necessary to incorporate those documents in the statement of facts. The trial judge certified that the statement of facts contained all the material facts, matters, and proceedings theretofore occurring in the cause "not already a part of the record herein."
The foregoing presents an entirely different situation from those presented in the authorities cited by respondents. The motion is denied.
The testator attended Ripon College at Ripon, Wisconsin, and was educated for the Episcopal ministry. He contemplated going to China as a missionary, but while in Seattle concluded to enter other fields of activity not connected with his profession, and in the pursuit of which he built up a substantial estate. His education prompted him to demand a high standard of female sex morality. He was opposed to the drinking of strong intoxicating liquor and smoking and gambling by young people and thought it affected the morals of those who so indulged. He was suspicious of drugs and medicines, and of the motives of those who had occasion to administer them to him. It may be fairly inferred that he entertained rather strict views on the subject of divorce and remarriage. He was a person of strong likes and dislikes and inclined to speak in an exaggerated manner, especially when disturbed and angry. He manifested a great affection for Ripon College, and was interested in the efforts of young men securing an education. *Page 330 
These factors, along with such of the findings made by the court as appear to us to have been established by the requisite quantum of proof, have an important bearing upon the questions we must determine from the record before us.
In 1914, the testator and his wife were divorced, at which time Gwyneth and Natalie were twelve and ten years of age. The custody of the girls was awarded to their mother. In 1915, and again in 1919, the testator petitioned the court for a modification of the divorce decree so as to award the custody of the girls to him. At the hearings, testimony was given reflecting upon the moral character of the mother and tending to show they were being reared in an unwholesome atmosphere not at all conducive to their moral well-being. On appeal from one of the orders of the court, we found the mother to be an unfit person to have the custody of the girls. We were of the opinion that the custody of Natalie might properly be awarded to her father were it not for the antipathy she exhibited towards him. (O'Neil v. O'Neil,112 Wn. 160, 191 P. 849.)
The inference to be drawn from the efforts made by the father to secure custody of his children, and the evidence submitted in support thereof, is that he had concluded that Gwyneth, and perhaps Natalie also, had become girls of bad character, and that his former wife had been a lewd person. The result was that a bitter estrangement arose between father and daughters. This may account for some suspicion on the part of the testator that Gwyneth was not his daughter, though subsequent events tend strongly to indicate that he did not harbor this idea in later years. In all of his wills, he recognized her as his daughter. The thought expressed by the testator that Gwyneth was a prostitute appears to have become intensified by her early and rather hectic matrimonial career, she having been married and divorced twice in her very early years. During the period of time between the custody hearings and the death of the testator in March, 1948, there were long periods of time when he and his daughter Gwyneth were estranged and *Page 331 
he manifested a very bitter and hostile attitude towards her. From sometime in 1937 to 1940, and in 1946 to the time of his death, they were on friendly terms. Prior to about the year 1940, a more friendly relationship seemed to exist between testator and Natalie. Except during the years of 1937 to 1940, the testator and his daughters saw each other infrequently. They do not appear to have had much in common. In 1940, an episode occurred which caused all of the bitterness of the past to be revived and intensified, when the daughters accused their father of an abnormal sex perversion, and it can well be inferred that this was never wholly forgiven. We have been unable to find from the record what, if any, overt act on the part of Natalie caused the testator to get the idea that she had tried to poison him, nor the approximate time when such idea originated.
We must conclude from the record that the ideas entertained by the testator that Gwyneth was not his child and that Natalie had tried to poison him were without any substantial foundation in fact. We can appreciate, however, that, in view of his rather puritanical views on the subject of sex morality, he could have believed, consistent with a sane mind, that his daughter Gwyneth while she was in her mother's custody had stepped aside from the path of virtue, and that her matrimonial career had not improved her standards. Just to what extent the testator entertained this view of Gwyneth in later years, is difficult to determine from the evidence, other than the fact that he had referred to her in conversations with others as a prostitute. The word may have been used as an epithet in view of the hostility between them. After a careful study of the record, one finds it difficult to conclude that, in later years at least, the testator really entertained the fixed beliefs with reference to his daughters with which he is charged. The poisoning idea is somewhat refuted by the fact that, during one period of seeming reconciliation with Natalie, he visited her home and ate food she had prepared.
We are unable to find from the record that the respondents *Page 332 
have proven by even a preponderance of the evidence that any delusions (if we can call them such) the testator may have entertained in any way affected his testamentary disposition. This finding is supported by his will-making history. In 1920, he made a will in which he mentioned Gwyneth and Natalie, but declared they had not deported themselves toward him so as to entitle them to any part of his estate. He bequeathed his watch and chain to a friend and such of his furniture, household goods, pictures, and personal effects as she might desire to his sister. The remainder of his estate he placed in trust for the benefit of his sister and her husband during their lifetimes. He directed that, upon the death of the beneficiaries, their property be converted into money and turned over to the board of trustees of Ripon College to be held and known as the Garrett W. O'Neil Fund and directed the manner of its use toward aiding needy boys to obtain an education at the college. There is no claim that he was then under any insane delusions which guided the making of this will. Apparently, he was motivated by the hostility existing between his daughters and himself as a result of the custody hearings and the affectionate regard in which he always held Ripon College and a desire to assist in the education of worthy young men.
In 1938, the testator made a visit to Europe. Before leaving, he made a will in which he made certain specific bequests. He made a substantial bequest in trust to a daughter of Natalie to be used for her education after she had finished high school. All of the rest of his estate he gave to his two daughters in equal shares. At this time, he and his daughters were on amicable terms.
In a will made May 3, 1947, he specifically mentioned Gwyneth and Natalie and stated that he did not leave them or their descendants anything under the will, and that he had intentionally made no provision for them and would make no further mention of them in his will. He made specific bequests to different persons than mentioned in his former will. He gave the rest of his estate to the National *Page 333 
Bank of Commerce of Seattle, in trust, with directions to create a scholarship fund to provide scholarships at Ripon College for deserving students who otherwise would be financially unable to attend college, and directed in much detail how the funds should be administered.
It is apparent that, in the time that followed, he gave much thought to the disposition he desired to make of his property. Using a copy of his last will, he made many changes in his own handwriting, particularly with reference to specific bequests. He indicated plainly that he desired the paragraph with reference to his daughters carried forward into the will which was in the making. He took the copy of the will he had thus changed to his attorney, and at his direction the attorney made notes thereon of other changes he desired. The attorney then prepared, and the testator executed, the will now in question. At that time, the testator met all of the tests we have pronounced to be necessary for testamentary capacity.
The several and different provisions of the respective wills with reference to benefits to be conferred upon students at Ripon College show a studied effort to make his estate confer what he deemed the greatest possible benefits to the greatest number, and indicates the operation of a very clear mind on this particular subject. The will must be given effect unless it can be found that it was made while the testator was laboring under insane delusions with reference to his daughters and that such delusions were his guide in making his testamentary disposition.
Our leading case upon the subject of insane delusions as affecting testamentary capacity is In re Klein's Estate, 28 Wn.2d 456, 183 P.2d 518, in which we cited such of our cases as referred to the subject. Appended to the report of the case ofJackman v. North, 398 Ill. 90, 75 N.E.2d 324, 175 A.L.R. 868, is an annotation on the subject of insane delusions from which it appears that the rules we pronounced in the Klein case have the support of preponderant judicial opinion.
[2] Medical and legal authorities recognize that a person *Page 334 
may be insane with reference to a certain subject or subjects and have one or more delusions, but notwithstanding such deficiencies may have testamentary capacity either during lucid intervals or if the delusions do not furnish the guide to his testamentary act. We are not considering a testator who had suffered a general mental collapse, or one afflicted with progressive senility, or having the delusions which often accompany such infirmity, but a testator who we find had testamentary capacity unless afflicted with specified delusions. We pointed out in our opinion and the authorities from which we quoted that an insane delusion denotes a false belief, which would be incredible in the same circumstance to a person of sound mind, and from which he can not be dissuaded by any evidence or argument, and that if found to exist it materially affected the will. It is not every insane delusion that will render a will invalid, but only such as enters into the product of the testamentary instrument.
Much reliance is placed upon the Klein case, in which a will was declared invalid upon the ground that its making and execution was prompted and guided by an insane delusion on the part of the testratrix that her daughter had attempted to poison her. A comparison of that case with the one before us will demonstrate such a substantial difference between them as to warrant different conclusions. Mrs. Klein had resided with her daughter, and there had been a strong bond of affection between them. While eating a pudding served in a dish made of thin opalescent glass, she discovered a small piece of the glass which had become broken off and lodged in the pudding. Mrs. Klein became suspicious that an attempt had been made to poison her. The idea grew in her mind and became an obsession. Its intensity increased. She made many accusations to various people that her daughter and son-in-law were attempting to kill or poison her. The total absence of any rational foundation for such an idea in view of the affectionate relationship, its progressive development, and the effect it had upon the mental processes of Mrs. Klein, prompted the trial *Page 335 
judge and this court on appeal to conclude that the will made by her was the product of an insane delusion. The will was unnatural in that the testatrix left the sum of one dollar to her daughter, her only child, and the remainder of her estate, except two hundred dollars, she gave to the church of which she was a member. By reason of her advanced years, she showed many symptoms of senility. Efforts were made by friends to dissuade her from her belief, but without avail.
In the case before us, we have no evidence of any overt act or incident which the testator might have attributed to his daughter Natalie which originated a thought in his mind that she attempted to poison him. He did not fear the food she prepared, as he dined in her home when they were on friendly terms. In view of the ill-feeling existing between father and daughter, it may well be that something may have transpired which gave rise to the poisoning idea consistent with a rational mind. There is no evidence tending to show that the testator became obsessed with the poisoning idea or that it continued in his mind to such an extent as to have been the guide to his attitude towards his daughter. The evidence is not sufficient to establish a fixed belief his daughter would poison him, and it does not support an inference that his will was the product of that belief.
[3] We have in mind all that we have heretofore said many times as to the effect we must give to the findings of fact made by the trial judge because of his better opportunity to evaluate the testimony given by the witnesses. Our conclusions are not based upon the veracity of witnesses. We have accepted many of the findings of the trial judge as to the character, habits, and disposition of the testator. There is much doubt in our minds that the aspersions of the testator directed to his daughter Gwyneth and his accusations directed to Natalie fall within the category of insane delusions on his part, but, even though we should accept them as such, we do not think they were so firmly fixed in his mind that he was incapable of being dissuaded by evidence or reason, or that they affected his testamentary *Page 336 
disposition. The beliefs to which he gave expression seem only to have existed when the relations between himself and his daughters were strained. We are satisfied from the whole record that the testator finally concluded that his daughters were not worthy objects of his bounty and that the estate would be put to the most beneficial use by the disposition he made in his will.
The judgment is reversed, and the cause remanded for the entry of an order reinstating the will of the testator. We believe the contest of the will was initiated in good faith, and no costs or disbursments shall be allowed in this court.
SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.
SIMPSON, C.J., dissents.
March 9, 1950. Petition for rehearing denied. *Page 337