[No. 15319-3-III. Division Three. October 28, 1997.]

*In the Matter of the Estate of* STEPHEN WATLACK.

DOROTHY SANFORD, ET AL., *Appellants*, v. DAWN FREEMAN, ET AL., *Respondents*.

*Gary J. Libey* of *Nuxoll, Libey, Ensley & Esser*, for appellants.

*Albert J. Golden* of *Golden & Knowlton, P.S.*, for respondents.

KURTZ, J. — Between March 26, 1988, and June 22, 1988, Stephen Watlack executed two wills. The first will named his children as beneficiaries and the second will disinherited them in favor of the children of his favorite brother. The trial court set aside the second will as the product of an insane delusion and admitted the first will to probate. The personal representative and beneficiaries of the second will appeal. We hold that the facts support the trial court's conclusion that Mr. Watlack was suffering from an insane delusion at the time he executed the second will.

## FACTS

Stephen Watlack was born on August 3, 1902. He was

divorced in 1963, and thereafter maintained only sporadic contact with his two children David Watlack and Dawn Freeman. In March 1988, Dawn Freeman went to California to assist her father in a dispute he was involved in with his long-time companion, Dorothy Gregory. This dispute arose over the disappearance of approximately $100,000 of cash, which Mr. Watlack believed Ms. Gregory's nephew, Gordon Scott, had taken. At the same time, Mr. Watlack had a delusion that Mr. Scott had hit him over the head. Mr. Watlack made an attempt to attack Mr. Scott with an ax as a result of this delusion.

This dispute led to litigation between Mr. Watlack and Ms. Gregory and Mr. Scott. The parties negotiated a settlement wherein Mr. Watlack received his home in Falbrook, California, and a 1983 Lincoln automobile. As part of the settlement, he agreed to release all of his claims against Ms. Gregory and Mr. Scott and to drop criminal charges. At this time, it was also determined that Mr. Watlack would sell his home and return to Starbuck, Washington, to live with his daughter.

On March 26, 1988, Mr. Watlack executed a will while still a resident of California, designating his two children as the sole beneficiaries. A prior will designated Ms. Gregory as the beneficiary.

In April 1988, prior to returning to Starbuck, Washington, Mr. Watlack transferred ownership of his 1983 Lincoln to Dawn Freeman and placed his home in California for sale. He opened a joint checking account in Dayton, Washington, with Ms. Freeman. In May 1988, he gave Ms. Freeman $200 to purchase clothes for herself and her children. He subsequently accused her of stealing the $200.

At this time, he was constantly talking about what he would do with the proceeds from the sale of his house. His house sold and a check for $98,000 was issued on May 31, 1988. When Mr. Watlack inquired about this money, Ms. Freeman told him she had not yet received it. Ms. Freeman had in fact arranged for the check to be held in California. She did not intend to permanently deprive or

misappropriate Mr. Watlack's funds, but was fearful that if the check came in the mail, he would cash it, leave, and dissipate the funds. At no point, did Mr. Watlack authorize Ms. Freeman to take control of the proceeds of his house sale.

Mr. Watlack moved from the Freeman home in the latter part of May 1988. At that time, he was angry with Ms. Freeman. He accused her of being a thief, and stated he wanted to return to the sea. Thereafter, he lived in a motel for a few days, and then lived in a foster home run by Mr. and Mrs. Sanford until he was placed in a nursing home in Walla Walla in September 1989. Ms. Freeman and her husband attempted to visit Mr. Watlack at the foster home on May 29, 1988, but he became extremely angry and accused them of stealing his money. The Sanfords requested that they not return as it was too upsetting.

Ms. Freeman returned from a trip to California on June 17, 1988, and promptly turned the sale proceeds check over to Dayton attorney Terry Nealey. Initially, she had contacted Mr. Nealey on May 5 about a real estate matter concerning Mr. Watlack and thereafter on May 25, to inquire about a guardianship for him. She was concerned about his desire to take his money and return to the sea, and his desire to obtain revenge against Mr. Scott. She was also concerned that someone would take his money. At that time, Mr. Nealey agreed to represent her with respect to the guardianship for her father.

In the meantime, on June 15, 1988, Mr. Watlack asked Mrs. Sanford to make an appointment for him with an attorney. He wanted to change his will. Acquainted with Mr. Nealey, she scheduled an appointment for June 17. During this meeting, Mr. Watlack identified his family members, including his children and niece and nephews, and named the niece and nephews as the sole beneficiaries because they were the children of his favorite brother. None of these relatives visited him in Washington or came to his funeral. One of them, Audrey Watlack, visited him in California in April 1988, when he had his dispute with

Ms. Gregory. At the time of his meeting with Mr. Nealey, Mr. Watlack stated that he did not want to leave his son and daughter anything. He expressed his anger with Ms. Freeman and again accused her of stealing money from him. The provision in the will disinheriting Mr. Watlack's children stated that they were to receive nothing because he had spent very little time with them and had previously given Ms. Freeman his 1983 Lincoln.

On June 21, 1988, Ms. Freeman and her husband met with Mr. Nealey to discuss Mr. Watlack's guardianship. At this time, Ms. Freeman turned over the check for $98,000 and the bank account cashier's check for $1,500. Later that day, Mr. Watlack returned to Mr. Nealey's office to sign his will. Mr. Nealey then disclosed to Mr. Watlack that Ms. Freeman had delivered to him the $98,000 check, and a cashier's check for $1,500 from his bank account. He also advised Mr. Watlack of the guardianship petition. Mr. Watlack agreed to the guardianship so long as Mrs. Sanford was appointed as his guardian. Mr. Watlack requested that the check for $98,000 be placed into an interest bearing account.

The next day Mr. Watlack returned to Mr. Nealey's office to sign his new will. Angry and pounding the desk, Mr. Watlack again accused his children of stealing the money now in Mr. Nealey's possession. Concerned about his capacity to make a will, Mr. Nealey tried to calm his client. Although agitated, Mr. Watlack had testamentary capacity at the time of the signing of the June 22, 1988, will. Nonetheless, on that date he still held the false belief that Ms. Freeman had stolen money from him and continued to accuse her of taking the money. From at least March 1988 through the date of his eventual death, Mr. Watlack suffered from this and other insane delusions.

The guardianship was commenced in superior court on June 22, 1988. The guardian permitted Mr. Watlack to maintain a checking account until September 1989, to which his pension was deposited and from which personal expenses,

including foster home charges, were deducted. Mr. Watlack had a habit of stashing cash and this behavior continued while he lived in Washington. Out of money from his checking account, he accumulated more than $2,000 hidden under his mattress that was discovered when he went to a nursing home in Walla Walla in September 1989.

Mr. Watlack died on December 16, 1993, in Walla Walla. Ms. Freeman petitioned the court to admit his will dated March 26, 1988, and Audrey Watlack, Mr. Watlack's niece, filed an objection and petitioned the court to admit his will dated June 22, 1988. After a trial, the court made all of the findings recited in this summary of the facts. Based on these findings, the court determined Mr. Watlack had suffered from an insane delusion at the time he executed the June 22, 1988, will and made the following conclusions:

4. Watlack had no rational basis to believe that Dawn Freeman had stolen the house proceeds.

5. Watlack was suffering from an insane delusion at the time he executed the June 22, 1988 will.

6. As of the afternoon of June 21, 1988, there was no rational basis for Watlack to believe that Dawn Freeman had stolen the house proceeds. The evidence was overwhelming to the contrary. The evidence did not change between June 21 and the date the will was executed on June 22, 1988. There was no rational basis for Watlack to believe Dawn Freeman had stolen other monies from him either. On June 22 Watlack had testamentary capacity.

7. Watlack had not put aside his insane delusions when he made the will on June 22, 1988.

8. Dawn Freeman and David Watlack were disinherited based upon Watlack's extreme anger caused by insane delusion and not on the basis that Watlack had taken care of Mrs. Freeman by a lifetime gift or that he had little contact with Dawn Freeman and David Watlack.

The court admitted to probate the March 26, 1988, will

designating Mr. Watlack's children as the sole beneficiaries. Dorothy Sanford, as the personal representative of the will dated June 22, 1988, and Mr. Watlack's niece and nephews appealed.

## ANALYSIS

■ Mr. Watlack's children contend this appeal should be dismissed because the appellants did not file a report of proceedings, citing *Heilman v. Wentworth*, 18 Wn. App. 751, 571 P.2d 963 (1977), *review denied*, 90 Wn.2d 1004 (1978) and *City of Seattle v. Torkar*, 25 Wn. App. 476, 610 P.2d 379, *review denied*, 94 Wn.2d 1001 (1980). These cases are distinguishable because they involved incomplete records that were insufficient for adequate review by the appellate court. Here, appellants are not asserting any factual challenges, but are challenging whether the conclusions are supported by the court's findings. RAP 9.1(a) provides that the record on review may consist of a report of proceedings but does not make the filing of such a report mandatory. Because the clerk's papers and findings of fact and conclusions of law provide a sufficient record for review here, the filing of a report of proceedings was not necessary. These unchallenged findings of fact are verities on appeal. Our review is limited to determining whether the conclusions of law are supported by findings of fact. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978).

■■ As will contestants, Mr. Watlack's children have the burden of establishing the will's invalidity by clear, cogent, and convincing evidence. *In re Estate of Meagher*, 60 Wn.2d 691, 692, 375 P.2d 148 (1962). A person may be insane regarding a certain subject and have one or more delusions, but despite such deficiencies that person may have testamentary capacity. *In re Estate of O'Neil*, 35 Wn.2d 325, 334, 212 P.2d 823 (1949). A will may be invalidated if it is shown by clear, cogent, and convincing evidence that at the time the will was executed, the testator was laboring under insane delusions that materially af-

fected the disposition of the will. *Meagher*, 60 Wn.2d at 692. Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be highly probable. *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

An "insane delusion" is not well defined by case law. It has been defined as a false belief, which would be incredible in the same circumstances to the victim if he were of sound mind, and from which he cannot be dissuaded by any evidence or argument. *In re Estate of Klein*, 28 Wn.2d 456, 472, 183 P.2d 518 (1947). It was later described as a condition of such "aberration as indicates an unsound or deranged condition of the mental faculties . . . ." *Meagher*, 60 Wn.2d at 693 (quoting *Owen v. Crumbaugh*, 228 Ill. 380, 81 N.E. 1044, 1051 (1907)). A belief resulting from a process of reasoning from existing facts will not be an insane delusion, regardless of whether the reasoning is imperfect or the conclusion illogical. *Meagher*, 60 Wn.2d at 693.

Mrs. Sanford first challenges conclusions of law 4 and 6, wherein the court determined Mr. Watlack had no rational basis to believe Ms. Freeman had stolen the house proceeds or other monies from him as of the afternoon of June 21, 1988. These conclusions are supported by the court's findings that Mr. Nealey disclosed to Mr. Watlack the day before the execution of his will, the fact that Ms. Freeman had obtained and delivered to his office the $98,000 house proceeds check and a $1,500 check from Mr. Watlack's bank account; Mr. Watlack specifically requested the check be placed in an interest bearing account later that day; at the time of the will signing, he continued to accuse her of stealing the money even though he was aware the check was in his attorney's possession; and Mr. Watlack had given Ms. Freeman $200 for clothing in May 1988 and later accused her of stealing the money.

She also challenges conclusion of law 5, wherein the court determined Mr. Watlack was suffering from an

insane delusion at the time he executed the June 22, 1988, will. The court found Mr. Watlack was very agitated and angry at the time he signed his will on June 22, 1988, because he falsely believed Ms. Freeman had stolen money from him even though he knew the proceeds check was in the possession of his attorney. Likewise, the court found Mr. Nealey had informed Mr. Watlack that Ms. Freeman had delivered the proceeds check to his office on June 21, 1988, yet Mr. Watlack continued to believe Ms. Freeman had stolen the money. Mr. Watlack's continued adherence to this false belief despite all evidence to the contrary which was presented to him constituted an insane delusion. The court's conclusion that he was suffering from this insane delusion during the execution of the will is supported by the findings.

Mrs. Sanford next challenges conclusion of law 7, wherein the court determined Mr. Watlack had not put aside his insane delusions when he made the will on June 22, 1988. This conclusion is directly supported by the court's findings that Mr. Watlack suffered from insane delusions from at least March 1988 through the date of his death, became angry at the will signing because he falsely believed Ms. Freeman had stolen his money and continued to accuse her of such on that date, and continued to make accusations of her stealing the money long after his guardianship was established in June 1988.

Finally, Mrs. Sanford challenges conclusion of law 8, wherein the court determined Ms. Freeman and her brother David Watlack were disinherited based upon Mr. Watlack's extreme anger caused by an insane delusion and not on the basis that he had little contact with them or that he had previously given Ms. Freeman his car. Mrs. Sanford contends these reasons supply other motives for the disposition made, and Ms. Freeman did not establish the insane delusion was the controlling factor in the disposition.

This contention, however, is not supported by the court's findings that Mr. Watlack made arrangements to see an

attorney about a new will shortly after an outburst with the Freemans wherein he accused them of stealing his money; while meeting with Mr. Nealey about the will, he stated he did not want to leave his children anything and again accused his daughter of stealing his money; and at the will signing again became agitated and angry with his daughter, pounding his fist on the desk and accusing her of stealing his money. Instead, the facts here indicate Mr. Watlack's insane delusion was the controlling reason for the new disposition in his June 22, 1988, will. In summary, the findings of fact support the conclusion that the June 22, 1988, will is a product of an insane delusion.

 RCW 11.24.050 provides where a will is annulled, assessment of costs shall be in the discretion of the court and where the will is upheld,

> the court may assess the costs against the contestant, including, unless it appears that the contestant acted with probable cause and in good faith, such reasonable attorney's fees as the court may deem proper.

Mr. Watlack's children claim they are entitled to fees and their cousins are not, relying primarily upon *In re Estate of Niehenke*, 117 Wn.2d 631, 648, 818 P.2d 1324 (1991). In *Niehenke*, the court stated it is inappropriate to assess fees against an estate when the litigation benefited only certain rival beneficiaries to the estate, because such an award would unjustly penalize the beneficiaries not involved in the litigation. *Niehenke*, 117 Wn.2d at 648. However, the *Niehenke* court did not hold that attorney fees could never be appropriately awarded against an estate and it recognized that there will be situations where attorney fees are justly assessed against an estate. *Niehenke*, 117 Wn.2d at 648. Unlike the *Niehenke* case, this litigation involves all the beneficiaries under both wills. Where all the beneficiaries are involved in a dispute, the award of fees against an estate may be justly imposed because the litigation ascertained their respective rights. *In re Estate of Burmeister*, 70 Wn. App. 532, 540, 854 P.2d

653 (1993), *rev'd on other grounds*, 124 Wn.2d 282, 877 P.2d 195 (1994).

The instant case involves a will contest between the personal representatives of two separate wills. In the case of *Klein's Estate*, 28 Wn.2d at 475, the court stated:

> Where a will is contested, whether before or after its probate, it is the duty of the executor to take all legitimate steps to uphold the testamentary instrument; and if he does so in good faith, he is entitled to an allowance out of the estate for his costs and reasonable attorney fees necessarily incurred by him, regardless of whether or not he is successful in his defense against the contest of the will.

The proponents of both the March 26, 1988, and the June 22, 1988, wills are entitled to an allowance out of the estate for costs and reasonable attorney fees necessarily incurred in this litigation.

### HOLDING

The judgment of the trial court is affirmed. The proponents of both wills are entitled to an allowance out of the estate for their costs and reasonable attorney fees incurred in this litigation.

SWEENEY, C.J., and BROWN, J., concur.

Reconsideration denied November 26, 1997.