[No. 26921. Department Two. July 13, 1938.]

*In the Matter of the Estate of* WILLIAM BUSH, *Deceased.*

BESSIE SHOEMAKER, *Appellant,* v. CARRIE BILLINGTON *et al., Respondents.*[1]

*J. Will Jones* and *J. F. Knight,* for appellant.

*Sam L. Levinson* and *Jay Friedman,* for respondent.

[1]Reported in 81 P. (2d) 271.

BEALS, J.—William Bush died in the city of Seattle, February 6, 1937, aged approximately ninety years, leaving surviving him six daughters and three children of a deceased daughter. Mr. Bush had resided in the city of Seattle and vicinity for approximately thirty years, and up to a short time prior to his death, had been engaged in business as a grocer. Mr. Bush's wife died in 1930, and shortly thereafter, Mr. Bush, who was suffering from failing eyesight and old age, sold his grocery business and went to live with his daughter, Carrie Billington, and her husband, paying them for his board and lodging. The six surviving daughters of Mr. Bush were Alice Burghduff, Bessie Shoemaker, Regina (Jennie) Walters, Carrie Billington, Margaret Blake, and Emma Hiltbrunner. The three grandchildren were William, Charles, and Richard Luther.

Shortly after the death of Mr. Bush, a will which he had executed was admitted to probate. Under this will, the testator's daughter, Bessie Shoemaker, was named executrix without bond, she being the sole beneficiary under the will. Each of the other daughters was bequeathed one dollar, the grandchildren not being mentioned.

The five other daughters and two of the grandchildren contested the will, contending, first, that it was not executed pursuant to the statute; second, that the testator was mentally incompetent to make a will; and third, that the will was obtained through fraud and undue influence exercised by Mrs. Shoemaker. The executrix filed her inventory, showing some real estate and cash on deposit in a savings bank in the amount of $2,326. Later, the executrix moved to strike the cash item from the inventory. The matter came on regularly to be heard, and after a lengthy trial, a decree was entered denying Mrs. Shoemaker's motion to strike the cash item from the inventory, holding the will void,

and directing Mrs. Shoemaker to account for all the property of the estate which had come into her hands as executrix. From this decree, Mrs. Shoemaker has appealed.

Error is assigned upon the denial of appellant's motion for a nonsuit; upon the refusal of the court to strike the cash item from the inventory; upon the ruling of the court holding that the money belonged to the estate; and upon the setting aside of the will in appellant's favor. Appellant also contends that the trial court erred in denying her motion for a new trial.

The trial court filed a comprehensive memorandum opinion, and the decree contains extensive recitals of fact. It appears that the court was of the opinion that the will, which was dated February 18, 1936, was executed under the undue influence of appellant, and was not the free and voluntary act of the testator. Appellant earnestly contends that the trial court erred in overruling her motion for nonsuit and in proceeding with the trial. Examination of the record convinces us that the trial court ruled correctly upon this motion, and put appellant upon her proof. In support of her argument upon this assignment of error, appellant cites many authorities. Of the legion of cases involving will contests, no two are exactly alike, and each case must be decided upon its own peculiar facts. We are clearly of the opinion that the trial court properly overruled appellant's motion for a nonsuit.

The decree of the trial court must stand or fall upon the entire record. Appellant, Bessie Shoemaker, resided in Iowa. Mrs. Walters lived in Oregon. The other four daughters lived in Seattle or in the vicinity. Prior to 1930, appellant had occasionally visited her parents, at their invitation, the record indicating that Mr. Bush had the usual paternal affection for all of his children. During the month of September, 1935, after

residing for approximately four years with the Billing-
tons, Mr. Bush returned to the home which he had
formerly occupied with his wife. His reasons for
making this move do not clearly appear from the
record, but his pleasant relations with his daughter
and son-in-law apparently continued. At this time,
his eye sight was seriously impaired, and if not actually
blind, it is evident that his vision was very poor. His
daughters feeling that the old gentleman should not
live alone, it was arranged that appellant should come
to Seattle and become her father's housekeeper, the
cost of her transportation being provided for her. Prior
to this time, Mrs. Billington and her husband had borne
the greater portion of the burden of seeing that Mr.
Bush was comfortable and properly cared for. He
always paid his own expenses.

Prior to appellant's arrival in Seattle, Mr. Bush kept
his money on deposit in Washington Mutual Savings
Bank, the account standing in his name and that of
Mrs. Billington. After appellant's arrival in Seattle,
the account was carried in the joint names of her father
and herself, but the trial court was of the opinion that
both Mrs. Billington and appellant were mere agents
of their father for the purpose of facilitating the with-
drawal of funds as needed.

It clearly appears from the record that some ill feel-
ing existed between appellant and certain of her sisters.
In her letters, appellant referred to one of her sisters
as "Physic," and one letter contains a reference to
"Mag the rattel snake." Several letters, written from
Iowa by appellant to her sister Mrs. Walters, referred
to as Jen, are in evidence. In one of these letters,
dated September 19, 1935, appellant wrote:

"I just mailed you a letter as i got this this morning
will send it to you the ice has broke ha ha but the dam
hell cats has got him in thier claus Jen I would give

anything if you would go and take and live with him i see we have to but in evey place to get something out of him cant you in some way get to Seattle and go thier at his place and see him . . . "

. October 7th, she wrote in part as follows:

"I guess i told you jen you could get thier quicker than i can even if i did get the far go over to dad and tell him i will come and have him change the will she has got enough he out to pay her off at one dol and then you get some witnesses to go to dad and have dad tell all he has bought and spent up thier and what he has gave her the best would be to have a lawyler so he could be a strang wittness i tell you if this thing keeps up it will kill dad and then they will get it all now is time to fight and dont delay a minut . . ."

Appellant arrived in Seattle late in October, 1935, and on the 27th of that month, appellant wrote her sister a letter containing the following:

"Carrie she came one day Richard comes quiet often Ruth came and took us to the bank yesterday Dad wantes to put Emil ministrator take it out of Billingtons hands and jen it has to be taken car of write soon because Dad is quiet feevel dont tell him i told you about this ministrator we had thinges changed at the bank hoop a la we are getting the last laugh . . ."

The record amply supports appellant's statements to her sister, it appearing that within a very few days after appellant's arrival in Seattle, the bank account was changed.

Appellant returned to her home in Iowa early in July, 1936, leaving her father alone in his home, where he remained until a few days prior to his death, when he was removed to Mrs. Billington's home, where he died.

The testimony of appellant was taken prior to the trial, by way of a deposition, and she also testified in open court at the trial. The court took occasion to note

in considerable detail the fact that appellant's testimony was so confused and contradictory, and in some particulars so unbelievable, as to be completely discredited, not necessarily from the testimony of other persons, but from contradictions and false statements contained in her own testimony. The trial court stated that he gave no consideration to any testimony on the part of appellant, save as the same was corroborated by other reliable witnesses. We agree with the court in his opinion of appellant's testimony.

As above stated, it clearly appears that Mrs. Billington and her husband had borne the major portion of the burden of the care of the father, and that Mr. Bush had made a will constituting Mrs. Billington the chief beneficiary of his estate. Mrs. Walters testified that this will was the subject of much concern on the part of appellant, stating that on one occasion appellant had taken the will from among her father's papers and read it with interest and manifestations of displeasure. Appellant testified that, sometime prior to the execution of the second will, her father had torn his older will and directed its destruction. Concerning this matter, appellant wrote to her sister:

"Well i will tell you about the will first the next day after you left he got the will out and distroyed it he said the reason he dident oppen it wile you was here was on a count of you getting what you see i sure was glad when he burnt it up for i couldent get it off my mind but i wouldent done it if he hadent said he was going to distroy it i suppose when things get old that will be throwed in my face i talked to him about another copy and he said a lawyler did not make that will out it was that real estate man and he put the stamp on for he is a notary public well that is that . . . "

The second will was prepared by a friend residing in the neighborhood, who was not an attorney, and

who was summoned by appellant. The evidence as to the preparation and execution of the second will is unsatisfactory, and, as observed by the trial court, it cannot be accepted with confidence.

When appellant left her father to return to Iowa, she took with her the will which her father had executed in her favor. Appellant argues that her conduct indicates no more than the permissible desire of a child to be recognized, to a reasonable extent, in the division of the parent's property, but the record indicates much more than this. Her ill feeling against several of her sisters is clearly indicated, and we are convinced, as was the trial court, that her desire was to gain, not a fair share of her father's property, but as great an amount thereof as she could procure. By the will which she offered for probate, she would receive all of her father's estate.

Evidently, it was the wish of her sisters that she come out and act as her father's housekeeper. It nowhere appears that they sought to separate her from her father, or keep her from receiving a fair portion of his property. Mrs. Walters testified to certain conversations between appellant and herself, which throw further light upon the situation, and particularly upon appellant's desires in the matter.

The trial court expressly found that appellant intended to unduly influence her father to make a will in her favor, and to procure, during his lifetime, as much of his property as she could induce him to turn over to her. It is also recited in the decree that the will in appellant's favor was signed as the result of undue influence exerted by her, and was not the free and voluntary act and deed of the testator.

It is impossible to read the evidence without agreeing with the trial court in its estimate of the situation. Mr. Bush was almost ninety years of age,

practically blind and helpless, and while, under all the circumstances, his mind was probably as strong as that of the average person of his age, he was nevertheless peculiarly susceptible to the influence of a daughter who was acting as his housekeeper, and upon whom he was, to a great extent, dependent for his comfort. The decree of the trial court, holding that the will under attack was procured by undue influence exerted by appellant, is supported by the overwhelming weight of the evidence.

Appellant contends that the trial court erred in refusing to grant her motion to strike from the inventory the money on deposit in the Washington Mutual Savings Bank. As above, stated, this money stood in the joint names of Mr. Bush and appellant. Appellant relies upon Rem. Rev. Stat., § 3348 [P. C. § 373], subd. 3 (Laws 1929, chapter 123 [an act relating to and regulating mutual savings banks], § 2, subd. 3, p. 280), which provides that a deposit in the name of the depositor and another person, when made under the circumstances provided in the statute, shall become the property of such persons as joint tenants, with right of survivorship. The paragraph concludes:

"The making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding to which either such savings bank or the surviving depositor is a party, of the intention of both depositors to vest title to such deposit and the additions thereto in such survivor."

The money was undoubtedly the property of the decedent, William Bush, and he, beyond question, had for years found it inconvenient to personally attend to his own financial affairs. The section of the statute in question was considered by this court in the case of *Winner v. Carroll*, 169 Wash. 208, 13 P. (2d) 450, and the conclusion reached

" . . . that a deposit of the nature involved in this case presumptively creates an estate in joint tenancy with the attendant right of survivorship; that the presumption may be rebutted during the lifetime of both depositors, but that upon the death of either depositor the presumption, in the absence of fraud or undue influence, becomes conclusive in any action or proceeding to which the bank or the surviving depositor is a party."

Appellant testified that she supposed that her father placed this money in a joint account with her for his own convenience. This testimony would probably not, of itself, overthrow the presumption referred to in the statute. In view of the evidence, it is clear that Mr. Bush could not himself, without great difficulty, attend to business matters, or even withdraw money from his account. We agree with respondents that the evidence indicates no more than the establishment of a simple agency which rendered it easier for Mr. Bush to attend to his business affairs. In view of the ruling of the trial court upon this phase of the case, the purpose of Mr. Bush in associating with himself first Mrs. Billington and then appellant in connection with his bank account is not important. Some light is thrown upon appellant's opinion on the matter by the letter which she wrote to Mrs. Walters on October 27, 1935, above quoted.

*In re Fritz' Estate*, 130 Cal. App. 725, 20 P. (2d) 361, a district court of appeal of California held that a joint account, under the circumstances shown, was in fact a mere authorization to withdraw money, and that fraud had been practiced which prevented the application of the law governing joint accounts.

In the later case of *Olson v. Washington*, 18 Cal. App. (2d) 85, 63 P. (2d) 304, the district court of appeal refused to apply the doctrine of survivorship to a joint

account, holding that the same had been obtained by fraud and undue influence. In the course of its opinion, the court said:

"It must be admitted that there is very slight, if any, direct evidence that any word or act of appellant influenced the deceased to withdraw her money from her own account and place it in the joint names of appellant and herself. Direct evidence, however, is not indispensible. As stated in *Estate of Ramey*, (1923) 62 Cal. App. 413, 426 [217 Pac. 135], undue influence can hardly ever be shown in any way other than by circumstantial evidence."

At the time of the institution of the will contest in the case at bar, appellant was enjoined from disposing of any property of the estate. It was later discovered that appellant had withdrawn the money from the Washington Mutual Savings Bank and deposited it in another bank in the city of Seattle. The decree has kept the injunction in force. The decree recites:

"It further appearing that William Bush had a savings account in the Washington Mutual Savings Bank in Seattle, Washington, and that said Bessie Shoemaker took advantage of the mental and physical condition of said William Bush, and, by fraud and undue influence, caused said William Bush to create a joint account of the said savings account in her name and that of William Bush . . ."

By this paragraph of the decree, the trial court expressly found that William Bush, by fraud and undue influence exerted by appellant, was induced to associate appellant with himself in joint control of his bank account. We are of the opinion that this finding is amply supported by the record.

Finally, appellant argues that the trial court erred in overruling her motion for a new trial. This assignment simply presents the same questions argued by appellant on her other assignments of error.

426

Examination of the record convinces us that the decree entered by the trial court is abundantly supported by the evidence, and the same is accordingly affirmed.

MILLARD, GERAGHTY, BLAKE, and ROBINSON, JJ., concur.