[No. 29192-8-III.    Division Three.    March 20, 2012.]

*In the Matter of the Trust and Estate of* MARY VIRGINIA MELTER.

WILLIAM R. MELTER, *Respondent,* v. JOHN D. MELTER ET AL., *Appellants.*

288

*Francis J. Gebhardt, Robert F. Greer II*, and *J. Patrick Diener* (of *Feltman Gebhardt Greer Zeimantz PS*), for appellants.

*Michael M. Parker* (of *Powell Kuznetz & Parker PS*), for respondent.

¶1 SIDDOWAY, J. — A will is presumed valid but may be disregarded when a will contestant presents clear, cogent, and convincing evidence that it was the product of undue influence. John and Sandra Melter appeal the trial court's decision to set aside the fourth and final will of John's mother, Mary Virginia Melter, and corresponding transfers of assets that effectively disinherited his brother, William Melter, and left nearly all of her estate to John.

¶2 The evidence supports the court's findings that John failed to account for or clearly establish his mother's knowing consent to assets he transferred to himself during her

lifetime. It supports the court's finding that he shared responsibility with his brother for a contentious relationship between the two in which each withheld information from the other about preferential treatment they were seeking or received under their mother's estate plan. Nonetheless, in light of the sustainable findings of the court and supporting evidence—including the court's findings that Mary Virginia Melter had testamentary capacity at the time she signed her fourth will, had reasons for disinheriting William and favoring John, and explained her reasons and wishes to an attorney whom the court found to be acting in her interest—the court's ultimate conclusion of undue influence was not supported by clear, cogent, and convincing evidence. We reverse and remand for entry of judgment in favor of John and Sandra Melter.

## FACTS AND PROCEDURAL BACKGROUND

¶3 John and William Melter and their respective wives testified at trial to dramatically different versions of the sons' dealings with Mary Virginia Melter in the last five years of her life; ultimately the trial court found that the credibility of both sons was suspect and that neither came before the court with clean hands. The following history is therefore drawn virtually entirely from the factual findings of the trial court, in order to rely only on the evidence credited by the court. What limited details we have added are undisputed. The majority of the court's findings are unchallenged on appeal.

¶4 Mary Virginia Melter, who went by "Virginia," was born in 1921 and married John R. Melter in 1946. The couple had three children: Mary Jane, John D., and William.[1] John D., whom we refer to as John,[2] was eight years older than William, the youngest child. Virginia and her

---

[1] First names are used for the purpose of clarity.

[2] While there are three generations of "John" in the Melter family, we refer to only John D. Melter as "John" and refer to his father as John R.

husband executed reciprocal wills in 1995 under which the estate of the first to die would pass to the other, and the survivor's estate would pass in equal shares to their three children, per stirpes.

¶5 In May 2002, John R. and Virginia's daughter Mary Jane died of cancer. Virginia's husband became ill shortly thereafter and died in July 2002. The closely-timed deaths of Virginia's only daughter and husband left her in a vulnerable state, physically and emotionally. Virginia was unable to live on her own after her husband died; her original plan was to live with William and his wife in Kent, Washington.

¶6 Following John R.'s funeral and interment in a military cemetery in western Washington, William traveled to Florida to stay with his mother and help prepare for her move to the Pacific Northwest. All of her possessions, including her car and furniture, were shipped to William's home in Kent. During the couple of months William spent with Virginia in Florida, he influenced her, in her weakened state, to make significant changes to her estate plan. In a new will—her second, executed in September 2002—Virginia bequeathed her Florida home to William; left only $5,000 to Jennifer Winkler, Mary Jane's only child; and left the balance of the estate in equal shares to John and William. William obtained a power of attorney from his mother and took over management of her financial affairs. He did not tell his brother, John, about the new will. When asked by John for copies of their parents' wills, he failed to provide them.

¶7 In early October 2002, William flew with Virginia to Spokane, Washington. He left her to stay temporarily with John and his wife Sandra, who lived in nearby Liberty Lake, while William traveled with his wife to a family wedding in Hawaii. William brought Virginia's legal documents with him from Florida, having promised to deliver them to John, but then failed to do so, telling John he had inadvertently left them on the plane.

¶8 William suffered a serious heart attack in Hawaii and his extended recovery delayed Virginia's move to Kent. With the passage of time, she became comfortable living with John and Sandra and decided to make her home with them instead. Among reasons for her change of heart was that she would have been required to live in a retirement home in Kent, since William's home was a tri-level, with stairs she was unable to navigate. She could get around in John's home, in which she had her own bedroom and bathroom. She had not wanted to live in a retirement home, preferring to live with one of her sons.

¶9 Virginia was aware that she had executed legal documents during the time William spent in Florida in the fall of 2002. She was either not certain as to their substance or reluctant to acknowledge it, but whatever the case, there is evidence that by late 2002 she wished to change her will. Despite John's repeated requests that William send their mother's legal documents to Virginia, William failed or refused to do so.

¶10 In December 2002, John helped arrange for his mother to meet with Spokane attorney Steve Jolley, who drafted a revocable trust and a new will—her third—which she executed in December. The trust and will left Virginia's estate to her two sons, in equal shares, with John being named her successor trustee under the trust and personal representative of her estate. William was named alternate trustee and alternate personal representative. Virginia also executed a durable power of attorney in favor of John. It is undisputed that Virginia had testamentary capacity and was not subject to any undue influence at the time she executed the trust and third will.

¶11 John informed William that his mother had executed a new will, that it left her estate to the two sons equally, and that John was named personal representative and had been appointed his mother's attorney in fact.

¶12 Virginia and John continued to press William to send Virginia's medical and financial records and other

personal property that were in his possession, and in January 2003, Mr. Jolley wrote to William on Virginia's behalf, enclosing her signed confirmation that she was insisting that her records be sent to her. William complied. It was on receiving the records sent by William that John learned for the first time of Virginia's second will executed in Florida, substantially benefitting William.

¶13 At this point, John began the course of conduct principally relied upon by the trial court for its later finding that he exerted undue influence leading to Virginia's execution of a fourth will several months later. By late 2002 (if not earlier) John had a confidential relationship with his mother; by then, she relied upon John and his wife almost exclusively for her care. John was angry to learn of the second will that William had facilitated and failed to disclose. He was angry over William's refusal to return Virginia's personal possessions to her. The relationship between the two brothers became increasingly hostile. John drafted a letter to Mr. Jolley, signed by Virginia, requesting that Mr. Jolley prepare a fourth will that would disinherit William. John also hired a psychologist to verify that his mother was competent to execute a new will. Mr. Jolley declined the engagement to prepare the fourth will for reasons discussed hereafter. He referred John to another law firm, Trunkenbolz & Rohr.

¶14 John arranged for Virginia to meet with attorney Pamela Rohr in May 2003. At the time of the meeting with Ms. Rohr, Virginia was disappointed and upset with William for a number of reasons that she was able to clearly articulate to Ms. Rohr. Virginia had testamentary capacity at the time, was aware of her assets, knew the objects of her bounty, and was clear about how she wanted her estate distributed. She clearly articulated her reasons for wanting to disinherit William. Ms. Rohr drafted and Virginia executed Virginia's fourth will, specifically disinheriting William, bequeathing 99 percent of her estate to John, and bequeathing the remaining 1 percent to her granddaughter,

Jennifer Winkler. Virginia revoked the trust that had been prepared by Mr. Jolley.

¶15 Ms. Rohr testified that at Virginia's request, she sent only the revocation of trust to William; she did not provide him with the new will. John did not inform William that Virginia had disinherited him or executed a new will.

¶16 For the remaining four and a half years of her life, Virginia lived with John and Sandra. John spent a great deal of time and energy directing his mother's estate affairs. He transferred substantially all of her assets to himself and his wife before Virginia's death on March 21, 2007. Her estate had amounted to some $617,000 after the sale of her Florida home in April 2005. At the time of her death only $11,000 remained, in a joint tenancy account with John. William did not learn of the existence of the fourth will or become aware of John's transfers of assets until their mother's death.

¶17 John and his wife took excellent care of his mother during the years she lived with them. Virginia benefited from an excellent quality of life with them; they were solicitous of her and assured she had good medical care.

¶18 On the other hand, John, like William, criticized the other to their mother; drawing her into a hostile family situation they created by their arguing over how her estate would be handled and which of them would be in charge. Virginia was estranged from William during the years she lived with John.

¶19 It is unclear what money or property William received from his mother during her lifetime. He had been the recipient of many financial benefits and support from his parents and later his mother. There is evidence that he obtained at least $16,000 from her funds during the fall of 2002.

## TEDRA Proceeding

¶20 When William learned that he would take nothing under his mother's will, he commenced this action under

the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, in January 2008, asking that her fourth will be invalidated, that her third will and revocable trust be admitted to probate, and that John be removed as personal representative. In support of the relief, he alleged that John and his wife "kept . . . Virginia Melter secluded, without the opportunity to express her free will and wishes, during her stay with them from October 2002 to her death on March 21, 2007," that they "limit[ed] funds available for Ms. Melter to live on, monitor[ed] her telephone calls, letters, and all correspondence to third parties including relatives, and refus[ed] to allow Ms. Melter to have contact with third parties or relatives." Clerk's Papers (CP) at 8. He alleged that as a result of John's and Sandra's actions, "Ms. Melter was coerced into executing documents which were not of her own free will including revocation of the Trust and Last Will and Testament dated December 11, 2002 and the execution of a Will dated May 8, 2003, effectively disinheriting William R. Melter." *Id.*

¶21 A four-day trial to the court began in early May 2010. At the conclusion of the trial, the court took the matter under advisement. It issued a detailed written opinion, findings, and conclusions on June 16. Among its findings were the following, to which John has assigned error, and that were therefore not recounted in the background facts set forth above:

17.  . . . John D. demanded that attorney Jolley change his mother's will (executed in December 2002). John D. demanded that the will be changed to bequeath everything to John D.

. . . .

20.  . . . John D. shared his anger and disappointment with William, with his mother. John located an attorney for his mother (attorney Rohr), who would do what attorney Jolley refused to do, i.e., disinherit William. John D. drafted letters for his mother to sign. These letters directed attorneys to draft estate planning documents that disinherited his brother William.

. . . .

26. John D. and Sandra "fueled the fire" of [Virginia's] disappointment in William. John D. manipulated the situation and made direct demands on [Virginia's] attorneys.

. . . .

30. [Virginia's] final will, providing that John D. should inherit 99% of her estate was the result of overreaching on the part of John D.

CP at 111-12; Br. of Appellant at 1-3. Also of note were the following findings by the court on matters of credibility and equitable standing:

37. John D.'s credibility is suspect as demonstrated in his representations to and transactions with third parties.

38. William's credibility is suspect, based on the overall record and his actions in this matter.

39. Both John D. and William come before the court with unclean hands.

CP at 112.

¶22 From these and other findings, the trial court concluded that the serial transfers of virtually all of Virginia's assets to John and her fourth will were invalid. In reaching this conclusion, the trial court accepted William's argument, at least in part, that "the burden is on *John D.* to establish that he did not exercise undue influence." CP at 118 (Conclusion of Law 4) (emphasis added); *and see id.* (conclusion of law 5, stating that "John D. failed to prove he did not exercise undue influence"). Other conclusions suggest that the court nonetheless imposed the ultimate burden on William. *See id.* ("There is clear, cogent, and convincing evidence that John D. exercised undue influence over his mother in regard to the May 2003 will" (Conclusion of Law 4) and "[i]ndeed the evidence that [John] did exercise undue influence is overwhelming." (Conclusion of Law 5)).

¶23 The trial court ordered an accounting of Virginia's lifetime transfers and estate; determined that Virginia's

third, December 2002 will, should control the disposition of her estate; and determined that neither John, William, nor their wives should serve as personal representative. John and Sandra timely appealed.

## ANALYSIS

### I

¶24 We first address the parties' competing positions on how we should approach the issues on appeal. In the trial below, William urged an analysis of his claims that was chronological, focusing first on the disputed validity of the transfers made during Virginia's lifetime. The inter vivos transfers happened first, and were so substantial that there was virtually nothing left to pass by will.

¶25 A chronological approach allows William to direct initial attention to a shifting burden of production and persuasion that favors him. Generally, the party seeking to set aside an inter vivos gift has the burden of persuasion that the gift is invalid. *Endicott v. Saul*, 142 Wn. App. 899, 922, 176 P.3d 560 (2008). But if the recipient has a confidential or fiduciary relationship with the donor, as the parties agree was the case with John and Virginia, the burden of persuasion shifts to the donee to prove that the gift was intended and not the result of undue influence. *Id.*; *White v. White*, 33 Wn. App. 364, 368, 655 P.2d 1173 (1982) (citing *Meyer v. Campion*, 120 Wash. 457, 207 P. 670 (1922); *McCutcheon v. Brownfield*, 2 Wn. App. 348, 467 P.2d 868, *review denied*, 78 Wn.2d 993 (1970)). Where a confidential relationship exists, evidence to sustain the gift must show that it " 'was made freely, voluntarily, and with a full understanding of the facts . . . . If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected.' " *McCutcheon*, 2 Wn. App. at 356 (alteration in original) (quoting 38 Am. Jur. 2d *Gifts* § 106 (1968)). The

standard of proof to satisfy the donee's burden of persuasion is clear, cogent, and convincing evidence. *Endicott*, 142 Wn. App. at 922; *Pedersen v. Bibioff*, 64 Wn. App. 710, 720, 828 P.2d 1113 (1992). John's evidence that his transfers of funds from his mother's account to his personal account were gifts was limited to his own word and arguably the somewhat-supportive testimony of Ms. Rohr that in meeting to discuss changing her will, Virginia expressed the desire that John receive $5,000 a month for every month John and Sandra took care of her. Ms. Rohr's testimony is only partially supportive, however, because—while providing a rationale for the transfers—it is not consistent with the amount actually transferred or with Ms. Rohr's testimony that she advised Virginia to address John's entitlement as a percentage of her estate instead. RP at 418, 423-24.

¶26 For his part, John argues that we should first review the dispute over the fourth will. The effect of invalidating Virginia's lifetime transfers to John would be to restore them to her estate. The estate would then pass according to her will. If her fourth will is valid, then there is no relief that a court can award to William even if John failed to meet the burden, shifted to him, of persuading the court that transfers of Virginia's assets were her free, knowing gifts. Virginia's bequest of one percent of her estate to Jennifer Winkler under the fourth will was more than satisfied by John,[3] so if the will is valid, John would be entitled to distribution of whatever assets were pulled back into Virginia's estate. If the fourth will is valid, William lacks standing to attack the gifts. *See In re Estate of Frank*, 146 Wn. App. 309, 326-27, 189 P.3d 834 (2008), *review denied*, 165 Wn.2d 1030 (2009).

¶27 John's approach allows him to redirect our attention from his burden of persuading the trial court that Virginia's

---

[3] Jennifer Winkler, now Jennifer Bohlman, testified to as much, as a co-defendant and witness for John and Sandra. Report of Proceedings at 569; *and see* CP at 112 (Finding of Fact 36).

lifetime transfers were valid to William's burden of producing evidence that the fourth will was the product of John's undue influence. A will is presumed valid. It may be disregarded when a will contestant presents clear, cogent, and convincing evidence that the will was the product of undue influence. *In re Estate of Bussler*, 160 Wn. App. 449, 466, 247 P.3d 821 (2011).

¶28  It is well-settled law that when a will is alleged to be the product of undue influence, certain circumstances may, in and of themselves, raise suspicion or concern requiring countervailing evidence by the proponent of the will. *Dean v. Jordan*, 194 Wash. 661, 671-72, 79 P.2d 331 (1938), which is often relied upon as the earliest formulation of circumstances giving rise to concern, and their effect on the parties' proofs, explains:

> [C]ertain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.
>
> The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will.

The combination of facts shown by the evidence can be sufficient to create "a presumption . . . of such strength as to impose upon the proponent the duty to come forward with evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will." *Id.* at 672.

¶29 Unlike in the gift context, the existence of these cautionary circumstances does not shift the ultimate burden of proof. "The presence of these elements will not automatically invalidate a will; rather, they 'appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.' " *Bussler*, 160 Wn. App. at 466 (quoting *Dean*, 194 Wash. at 672). The combination of facts may be so suspicious as to raise a question of undue influence and, "in the absence of rebuttal evidence, may even be sufficient to overthrow the will." *Dean*, 194 Wash. at 672. But "the existence of [a question] does not relieve the contestants of the duty to establish . . . undue influence by clear, cogent, and convincing evidence" that the presumptively valid will should be disregarded. *In re Estate of Reilly*, 78 Wn.2d 623, 663, 479 P.2d 1 (1970); *In re Estate of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998) (same).[4]

---

[4] The Ninth Circuit Court of Appeals, applying Washington law in a diversity case, has assumed that decisions bearing on the shifting of the burden of persuasion where undue influence is alleged in the will context have equal application to cases involving undue influence in connection with the making of a gift. *Hilton v. Mumaw*, 522 F.2d 588, 599 (9th Cir. 1975) (applying holdings of *Reilly*, 78 Wn.2d 623 and *In re Estate of Hansen*, 66 Wn.2d 166, 401 P.2d 866 (1965) to challenge to lifetime transfers). But *Meyer*, a seminal case stating the burden borne by the donee of a lifetime transfer, observes that the rule as to inter vivos gifts is stricter, quoting with approval from *In re Sparks' Will*, 63 N.J. Eq. (18 Dick.) 242, 51 Atl. 118, 121 (1901):

"The controlling reason is, I think, because by a gift a man strips himself of that which he can still enjoy and of which he may have need during his life; while by his will he disposes of that which can be of no further use to him. As he is, under ordinary conditions, so much the less likely to do the first than the second, courts subject gifts to the sharper scrutiny."

*Meyer*, 120 Wash. at 470.

¶30 Because the dispute over the will is potentially dispositive, we agree with John's position that we should examine it first.

## II

¶31 John's appeal challenges several of the court's key factual findings underlying its conclusion that undue influence existed at the time Virginia executed her fourth will. The trial court's undue influence determination was its sole basis for invalidating Virginia's fourth and last will.

¶32 There is some confusion in our case law as to whether the presence of undue influence is determined as an issue of fact or law. *Compare Pedersen*, 64 Wn. App. at 720 ("The existence of undue influence is a factual question."), *and McCutcheon*, 2 Wn. App. at 356 (same proposition), *with In re Estate of Haviland*, 162 Wn. App. 548, 561-65, 255 P.3d 854 (2011) (assuming, without discussion, that trial court properly treated undue influence as a conclusion of law), *and Reilly*, 78 Wn.2d at 676 (Finley, J., dissenting) (addressing "the legal question of undue influence").

¶33 We are satisfied that the determination of undue influence presents a mixed question of fact and law. Mixed questions involve the application of legal precepts to a particular set of factual circumstances, *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 687, 167 P.3d 1112 (2007), precisely what is required of a court presented with a claim of undue influence. They differ from pure legal conclusions, such as whether a claim is barred by the statute of limitation, which follow necessarily from proof of certain critical historical facts. William W. Schwartzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 470 (1984). Although there is a divergence of opinion, other jurisdictions that have explored the distinction have also adopted the view that undue influence is a mixed question.

*Stockwell v. Stockwell*, 2010 SD 79, 790 N.W.2d 52, 58 (clarifying that "testamentary capacity and undue influence are mixed questions of law and fact and require a compound inquiry"); *In re Ingersoll Trust*, 950 A.2d 672, 692 (D.C. 2008) (explaining that "[u]ndue influence is a mixed question of fact and law, and our review of the legal issues is *de novo*").

¶34 When a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting substantial evidence review. A party claiming undue influence must prove it by clear, cogent, and convincing evidence. *In re Estate of Eubank*, 50 Wn. App. 611, 619, 749 P.2d 691 (1988). When such a finding is appealed, the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the "highly probable" test. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973); *Reilly*, 78 Wn.2d at 640 (recognizing that "[e]vidence which is 'substantial' to support a preponderance may not be sufficient to support the clear, cogent, and convincing" standard). We still view the evidence and all reasonable inferences in the light most favorable to the prevailing party, *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) and, as in all matters, defer to the trier of fact on issues of credibility. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010).

¶35 We therefore review the findings of fact challenged by John applying the clear, cogent, and convincing standard of proof and review de novo whether the supported and uncontested findings amount to undue influence.

*Finding 17: That "John D. demanded that attorney Jolley change his mother's will (executed in December 2002). John D. demanded that the will be changed to bequeath everything to John D."*

¶36 The evidence established that John typed the March 2003 letter to Mr. Jolley, signed by Virginia, that requested

that Mr. Jolley prepare a new, fourth will to disinherit William. There was no evidence of any communication from John to Mr. Jolley other than this letter that can be characterized as the "demand" referenced in finding 17.

¶37 The relevant implication of the finding is that the letter reflected John's wishes and direction, not Virginia's. But there is no positive evidence in the record that the letter reflected a demand by John rather than Virginia's wishes.[5]

¶38 William argues that the trial court was free (as it apparently did) to disbelieve John's testimony that he was merely relaying his mother's request and conclude the opposite: that he was the source of the requested changes. Br. of Resp't at 28. He cites no authority, but his argument brings to mind Judge Learned Hand's oft-cited observation in *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) that the testimony of a witness "may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story." However, the decision in *Dyer* goes on to hold that only in "strict theory" could a party succeed in convincing a jury on the basis of disbelief of a witness alone. *Id.* A court would have to direct a verdict against such a party because the evidence would be insufficient to sustain the verdict on appeal. *Id.* Such evidence may, with other evidence, advance a party's burden of persuasion but does not satisfy its burden of production. A trial court's disbelief of a witness is not *evidence in the record* that can support a finding.

¶39 Where, as here, the standard of proof is clear, cogent, and convincing evidence, it is especially clear that the court's adverse view of John's credibility cannot satisfy William's burden of production. " 'Mere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence.' "

---

[5] John testified that he was only a scrivener of his mother's wishes and request, but in light of the trial court's finding that John was not credible, we disregard his testimony bearing on this and other findings challenged on appeal.

*In re Estate of Smith*, 68 Wn.2d 145, 157, 411 P.2d 879, 416 P.2d 124 (1966) (quoting *In re Estate of Hansen*, 66 Wn.2d 166, 172, 401 P.2d 866 (1965)). Indeed, " '[n]either will mere suspicion, unaccompanied by evidentially supported implicating circumstances, give rise to a presumption of undue influence sufficient in strength to require rebuttal evidence.' " *Id.* (quoting *Hansen*, 66 Wn.2d at 172).

¶40 To the extent that finding 17 states or implies that John initiated the March 2003 letter to Mr. Jolley, there is insufficient evidence to support it.

*Finding 20 (challenged portion): That "John D. shared his anger and disappointment with William, with his mother. John located an attorney for his mother (attorney Rohr), who would do what attorney Jolley refused to do, i.e., disinherit William."*

¶41 Nothing in the record establishes that John conveyed his anger and disappointment with William to his mother. William makes no meaningful argument to defend the finding. Br. of Resp't at 28.

¶42 If the finding is read to state or imply that Mr. Jolley stopped providing services to Virginia because he refused to disinherit William, there is no supporting evidence. Mr. Jolley explained his reason for declining the engagement to prepare a fourth will as follows:

Q Did you make any of the changes requested in this letter?

A No. I declined to do that.

Q Why did you decline to do that?

A I felt at this point in time it would have been a conflict of interest for me to do it, or at least would not look good. So I didn't feel comfortable changing the will.

Q From your point of view, what was the conflict of interest?

A Well, between the time I prepared those estate planning documents and this letter, I had had some conversations with John Melter about various business transactions that he had

legal questions about that concerned him personally, not his mother. And I was just concerned that, you know, it just wouldn't look right for me to be hav[ing] ongoing transactions for both John and his mother, so I declined to make the changes to the will.

Report of Proceedings (RP) at 274. John's testimony was in accord, although John's testimony suggested that threats William had made might have heightened Mr. Jolley's concern about creating even the appearance of a conflict.

¶43 No evidence supports the finding insofar as it might be read to mean that letters typed or otherwise prepared by John were ever received or reviewed by Ms. Rohr. The testimony of Mr. Jolley and Ms. Rohr was consistent that Mr. Jolley never forwarded, and Ms. Rohr never saw, those letters.

¶44 No evidence supports the finding insofar as it might be read to mean that in locating Ms. Rohr, John sought to ensure she would be willing to prepare a particular will for his mother. Even disregarding John's testimony, the evidence establishes that John was referred to Ms. Rohr and her firm by Mr. Jolley. John did not independently locate her and there is no evidence that he had contact with her through which he could determine what she would be willing to do in regard to his mother's estate.

*Finding 26: That "John D. and Sandra 'fueled the fire' of [Virginia's] disappointment in William. John D. manipulated the situation and made direct demands on [Virginia's] attorneys."*

¶45 This finding is likewise not supported, since again there is no evidence that John or his wife spoke ill of William to Virginia or misrepresented facts to her. William claims that circumstantial evidence supports this conclusion because the reasons Virginia provided to Ms. Rohr as to why she wanted to disinherit him were factually incorrect, and misinformation could have come from only John. Br. of

Resp't at 30. However, Virginia's reasons as recounted by Ms. Rohr—to the extent that they were not subjective opinions—had a basis in fact. The portion of the trial court's decision introducing its formal findings of fact recapped Ms. Rohr's testimony that Virginia specifically expressed unhappiness with William based on "the documents that were drawn up in Florida, how her possessions were handled and shipped to Seattle, where her husband was buried, that her car had been shipped to Seattle, that all her legal documents had been kept from her by William and she needed them. She commented that 'Bill has taken so much money already.'" CP at 104. The trial court's formal findings included uncontested findings that William influenced Virginia while she was vulnerable in September 2002 to execute a new will considerably more favorable to William and continued to withhold Virginia's September 2002 will and other records until sometime after the execution of the December 2002 will; the court also found that even by the time of trial William admitted that he still retained some of Virginia's personal belongings.

¶46 The finding that John "manipulated the situation and made direct demands on [Virginia's] attorneys" is also unsupported. The record reflects that John had no real contact with Ms. Rohr before the execution of the May 2003 will and that he made nothing that can fairly be characterized as a "direct demand" of her. At best, William presented evidence that John notified Ms. Rohr's office staff of the prospect of a will challenge and his concern that the representation be handled to avoid an appearance of undue influence. It is not improper in a contentious family situation to recognize and raise the prospect of a will challenge so that preparation of the will may be handled in a manner that avoids not only impropriety, but the appearance of impropriety. Standing alone, the fact that such a concern is expressed and heeded is not proof that it is a contrivance to create a *false* impression. *Cf. Reilly*, 78 Wn.2d at 639 (discussion of prospect of will contest could not reasonably

be construed as admission of legal trickery or a dishonest transaction).

¶47 Finally, Ms. Rohr testified that after William learned that he had been removed as trustee and personal representative, he sent her numerous e-mails and had at least two lengthy (approximately 40-minute) conversations with her, "want[ing] me to see his side of it." RP at 431. Ms. Rohr spoke with Virginia, not John, about William's calls, and was given permission by Virginia to discontinue accepting and responding to William's contacts. *Id.* at 432-33. The trial court found no fault with Ms. Rohr's legal representation or other conduct.

*Finding 30: That "[Virginia's] final will, providing that John D. should inherit 99% of her estate was the result of overreaching on the part of John D."*

¶48 Finally, we review de novo the trial court's finding 30 that the will "was the result of overreaching" on the part of John, which we understand to be synonymous with its undue influence determinations set forth in its fourth conclusion of law.[6]

¶49 The right to dispose of one's property by will is not only a valuable right, but one assured by law. *Reilly*, 78 Wn.2d at 646 (quoting *In re Estate of Schafer*, 8 Wn.2d 517, 519, 113 P.2d 41 (1941)). In order to vitiate a will on this ground, " 'there must be something more than mere influence. There must have been undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice.' " *Id.* (emphasis omitted) (quoting *Schafer*, 8 Wn.2d at 520). *Undue* influence has been described as " 'tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.' " *Lint*, 135 Wn.2d at 535 (quoting *In re Estate of Bottger*, 14

---

[6] We need not reach challenged finding 31, which bears only on William's challenge to the validity of Virginia's inter vivos gifts.

Wn.2d 676, 700, 129 P.2d 518 (1942)). Actions such as "giving advice, arguments, persuasions, solicitations, suggestions or entreaties" generally do not amount to undue influence unless such actions are so importunate, persistent, or coercive that they effectively subdue and subordinate the will of the testator and take away his or her freedom of action. *In re Estate of Marks*, 91 Wn. App. 325, 333, 957 P.2d 235, *review denied*, 136 Wn.2d 1031 (1998).

¶50 The court was presented with evidence sufficient to raise a suspicion or presumption against the validity of the fourth will. Viewed in the light most favorable to William, the evidence established that John stood in a confidential relation to his mother; that he facilitated creation of the will by making the contact with Mr. Jolley that led to the referral to Ms. Rohr, made the appointment with Ms. Rohr, and drove his mother to the appointment; and that he was bequeathed virtually her entire estate under that will. Nonetheless, as *Dean* and later cases make clear, these facts alone do not satisfy William's burden of producing clear, cogent, and convincing evidence of undue influence.

¶51 In *Dean*, there was evidence that the testator was, at the time she executed the challenged will, elderly, and infirm, and had previously, during a period of despondency, been declared insane. The proponent of her will—one of her nieces—stood in a confidential relationship to her aunt, had the opportunity to exercise undue influence, had participated in the procurement of the will, and had been substituted for other relatives as the sole beneficiary of the estate. The court nonetheless found the niece's evidence sufficient to rebut the presumption and satisfy her burden of presenting evidence restoring the equilibrium of evidence touching the validity of the will. 194 Wash. at 673. It attached significance to the fact that the contestants presented no positive evidence of undue influence, relying instead entirely on the presumption. The niece, on the other hand, presented evidence that her aunt, "though old and

feeble was nevertheless capable of understanding and did understand what she was doing," and that the aunt was "appreciative of what the niece had done for her." *Id.*

¶52 John's evidence is sufficient to rebut the presumption and satisfy his burden of restoring evidentiary equilibrium for similar reasons. He established to the satisfaction of the trial court that Virginia "was disappointed and upset with William for a number of reasons which she was able to clearly articulate to attorney Rohr," CP at 112 (Finding of Fact 24); that she "had testamentary capacity when she executed the will[,] was aware of her assets, knew the objects of her bounty, . . . was clear about how she wanted her estate distributed," and "clearly articulated her reasons for wanting to disinherit William," *id.* (Finding of Fact 25); and that John and his wife "took excellent care of his mother and provided her with a comfortable home," *id.* (Finding of Fact 27). This evidence was a sufficient counterbalance to William's reliance on the presumption.

¶53 The findings that survive challenge on appeal do not support the trial court's ultimate conclusion that Virginia's fourth will was the product of undue influence.

¶54 We note, first, that William did not prove the facts alleged in his complaint to establish undue influence: the court did not find that John or Sandra kept Virginia secluded, limited funds available for her to live on, monitored her communications with third parties or relatives, or refused to allow her to have contact with third parties or relatives.

¶55 William's evidence falls short of key elements commonly found in decisions recognizing undue influence. There is no evidence outside of William and his wife's testimony that John attempted to exclude others from his mother. William himself testified that he maintained regular contact with his mother from October 2002 through January 2003 via telephone, and after that the phone calls became less frequent. Even the trial court recognized that "John D. may not have isolated his mother from William."

CP at 111 (Finding of Fact 20). Whether or not the proponent of a will isolated the testator from others has been identified as important evidence bearing on undue influence. *Lint*, 135 Wn.2d at 538; *Bussler*, 160 Wn. App. at 469.

¶56 William has not demonstrated that John's role in facilitating creation of the May 2003 will was one that interfered with Virginia's free will or prevented the exercise of her judgment or choice. Unlike the beneficiaries in *Lint* and *Eubank*, who directly negotiated the terms of the invalidated wills with the testators' respective attorneys, John was absent when Virginia met with Ms. Rohr to discuss the terms of her final will. He was not present at the execution of the will several days later. He did little more than schedule the appointment and drive Virginia to Ms. Rohr's office.

¶57 There is no evidence that Virginia was mentally vulnerable or of unsound mind at the time she executed her final will. Ms. Rohr, whose exclusive concern for her client, Virginia, was not doubted by the trial court, testified:

Q . . . [W]hen you met with Mrs. Melter, did you have an opportunity to observe and inquire as to her mental faculties?

A Yes.

Q What do you recall about that?

. . . .

Q What do you typically do? What did you do in Virginia's case?

A Well, in her case, there was nothing that made me think she was incompetent. She spoke for almost an hour. She always was consistent in what she said. She was consistent in what she wanted. She was consistent in the facts that she gave. She presented herself as a competent person.

Q And is that the standard or customary practice you—tell me—let me rephrase that. What is your usual and customary practice with respect to clients like Mrs. Melter?

A Well, the only thing that was different about Mrs. Melter or anybody else who walked in was that she was older, and that does not mean incompetent to me. She did want to significantly

change documents. You do pay attention as an attorney. There is just nothing inconsistent about what she was saying or what she wanted to do. So I had no reason to think that she might be incompetent.

RP at 416-17. A testator's strength of mind is obviously important evidence, bearing directly on the prospect that his or her free will was overcome, and is often noted when declining to find undue influence. *See Reilly*, 78 Wn.2d at 625; *Smith*, 68 Wn.2d at 151; *In re Estate of Malloy*, 57 Wn.2d 565, 570, 358 P.2d 801 (1961); *In re Estate of Martinson*, 29 Wn.2d 912, 919, 190 P.2d 96 (1948). In contrast, courts have voided wills for undue influence where the testators demonstrated "little or no mental capacity." *Smith*, 68 Wn.2d at 154 (citing *In re Estate of Ganjian*, 55 Wn.2d 360, 347 P.2d 891 (1959); *In re Estate of Jaaska*, 27 Wn.2d 433, 178 P.2d 321 (1947); *In re Estate of Tresidder*, 70 Wash. 15, 125 P. 1034 (1912)); *Lint*, 135 Wn.2d at 523; *In re Estate of Bush*, 195 Wash. 416, 422-23, 81 P.2d 271 (1938). The trial court's finding that Virginia had testamentary capacity when she executed her final will is undisputed on appeal and clearly supported by the evidence.

¶58 William has not demonstrated that the terms of the fourth will were unnatural or unexplained. While they were different from the terms of the will Virginia had executed in December 2002, the court found that Virginia "was clear about how she wanted her estate distributed" and that she "clearly articulated her reasons for wanting to disinherit William." CP at 112 (Finding of Fact 25). On this score, Ms. Rohr testified:

Q At that first meeting, what did Mrs. Melter tell you about how she wanted her will handled?

A Well, she wanted a provision for her granddaughter, the daughter of her deceased daughter, and she wanted everything else to go to John. And so we discussed, you know, a number of different ways that that could be accomplished.

Q And did you—did she tell you why she wanted it to go to John?

A Well, because John was taking care of her and so was his wife Sandra, and she was very happy there and she was very unhappy with Bill, so she wanted everything to go to John.

RP at 420. She testified further:

Q And what did she tell you about her son Bill?

A Well, she told me that she was very, very, unhappy with what occurred during that period of time when her daughter died and very shortly after that her husband died and she said she was very upset, stressed out. She had trouble remembering things that happened in that time. However, she does—she did remember and know after the fact that Bill had had her change estate documents and they were not the way she wanted them; that her property was taken from Florida to Seattle and she wanted them in Spokane. When she asked for clothes and personal [e]ffects, she told me she was sent a box of formal gowns, which were in Spokane. What is she going to do? That's what she had to wear. She just—she was not happy with that situation.

*Id.* at 418. When asked about her notes of her meeting with Virginia, Ms. Rohr testified:

Q . . . [I]n the middle of the page, it looks like, and maybe you can, if I['m] reading this wrong, correct me, it says something do or something or disinherit Bill, question mark, quote "absolutely!" end quote. Is that accurate?

A Yes, it is.

Q And is that your handwriting?

A Yes, it is.

Q And can you explain that, why you have "absolutely!" What's going on there?

A Well, when I asked her—because disinheritance is such a big issue, and it's such an unusual thing and she had mentioned it earlier that she wanted that, and we were kind of reviewing some things. And I asked her, "So you want to disinherit Bill?"

And the way she said "absolutely," she was so emphatic and clear that I wrote it to reflect the way she said it.

*Id.* at 420-21.

¶59 A prejudice or dislike that a testator might have for a relative is not ground for setting aside a will unless the prejudice and dislike cannot be explained on any other ground than that of an insane delusion in the sense of an unsound condition of the mental faculties, as distinguished from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion. *In re Estate of Meagher*, 60 Wn.2d 691, 693, 375 P.2d 148 (1962); *In re Estate of Watlack*, 88 Wn. App. 603, 609, 945 P.2d 1154 (1997).

¶60 What William did establish to the trial court's satisfaction was that John bore equal responsibility with William for a contentious relationship that contributed to Virginia's and William's estrangement. William established to the court's satisfaction that John could not meet his burden of proving Virginia's informed approval of his asset transfers during her lifetime. But on matters bearing on the validity of the fourth will, William proved, at most, that John may have had the opportunity to exert influence over Virginia.

¶61 William's burden is understandably much higher. Virginia's assets were hers, to dispose of as she wished, including to favor one child over another. When the court sets aside a will for undue influence, where, as here, the testator's competence is undisputed; the testator meets one-on-one with her lawyer, who has the opportunity to speak with the testator and assess her resolve; and there is no evidence the lawyer preparing the will was not acting independently, in what she believed to be the interest of the testator, one thing is guaranteed: the assets will not pass in the manner that the testator directed and assumed they would. In this case, the invalidation of the fourth will in favor of the third will caused the disposition of Virginia's

estate to revert to one she had arrived at before William withheld records and personal belongings from her; before she realized the extent of his breach of trust during her period of vulnerability; and before she arrived at her decision, reported to Ms. Rohr, to compensate John from her estate for his and Sandra's willingness to take her into their home.

¶62 It is because of the very real risk of frustrating the testator's right to dispose of her property that such things as advice, arguments, persuasions, solicitations, suggestions, or entreaties are not enough to establish undue influence. William has not met his considerable burden of demonstrating that John actually exerted influence that " 'controlled the volition of the testator, interfered with h[er] free will, and prevented an exercise of h[er] judgment and choice.' " *Lint*, 135 Wn.2d at 535 (quoting *Bottger*, 14 Wn.2d at 700).

¶63 Because the trial court's undue influence determination was its sole basis for invalidating the fourth will, its invalidation of the fourth will must be reversed. In light of the validity of the fourth will, William has no standing to challenge lifetime transfers of his mother's assets.

¶64 We reverse the trial court's orders set forth in its memorandum decision entered June 16, 2010 (1) invalidating Virginia Melter's fourth, May 2003 will; (2) declaring valid Virginia Melter's December 2002 will and trust and directing that they be admitted to probate; and (3) ordering an accounting. We remand for entry of judgment in favor of John and Sandra Melter.

¶65 Both parties request attorney fees, although John requests them for the first time in his reply brief. We deny the fee requests of both parties.

KULIK, C.J., concurs.

¶66 SWEENEY, J. (concurring) — The majority opinion is probably correct given case law precedent in this state. I

concur specially to explain why I think that precedent is analytically flawed and to explain, why in this case in particular, the correct analysis (deferring to the trial judge's findings rather than revisiting those findings here on appeal) might well require that we affirm the judgment here.

BURDEN OF PROOF

¶67 In all cases, the burden of proof consists of two parts—a burden of production and a burden of persuasion. *Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 433, 886 P.2d 172 (1994); *In re Dependency of C.B.*, 61 Wn. App. 280, 282-83, 810 P.2d 518 (1991).

*Burden of Production*

¶68 The party with the burden of proof must meet its burden of production; that is, make out a prima facie case or be subject to summary dismissal. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 149-50, 94 P.3d 930 (2004). A motion for summary dismissal (before, after, or during the trial) tests whether the party with the burden of proof has satisfied its burden of production. *See In re Det. of Capello*, 114 Wn. App. 739, 747, 60 P.3d 620 (2002). Said another way, the burden of production tests whether there is the "quantity of evidence fit to be considered by the trier of fact." *State v. Paul*, 64 Wn. App. 801, 806, 828 P.2d 594 (1992) (emphasis omitted). The test is "substantial evidence." It is always a question of law for the courts and, as such, suited for resolution by courts of review. *State v. Zamora*, 6 Wn. App. 130, 133, 491 P.2d 1342 (1971). That is because we can read the record, consider the elements of a crime or a cause of action or defense, and then pass on whether the party with the burden of proof has made a sufficient showing (presented substantial evidence) to have warranted submitting the matter to a trier of fact. We need not, indeed, I will argue cannot, pass upon the credibility of the witnesses and the overall persuasiveness of the evidence produced because we

have only the record of the proceedings. *Boeing Co. v. Heidy*, 147 Wn.2d 78, 87, 51 P.3d 793 (2002). It is a matter of institutional competency. Courts of review do not have the capacity.

*Burden of Persuasion*

¶69 The burden of persuasion is for the trier of fact and tests how persuasive the showing, the evidence presented, is. *Fed. Signal*, 125 Wn.2d at 433 ("The burden of persuasion is 'the burden of persuading the trier of fact that the alleged fact is true'. [Edward M. Cleary,] *McCormick on Evidence*, at 947 [(3d ed. 1984)]. It comes into play 'only if the parties have sustained their burdens of producing evidence and only when all of the evidence has been introduced'. *McCormick on Evidence*, at 947."). The burden of persuasion specifies the degree of certainty that a trier of fact must find to make a finding of fact. *In re Det. of Skinner*, 122 Wn. App. 620, 629, 94 P.3d 981 (2004). The burdens of persuasion range from preponderance of the evidence to clear, cogent, and convincing to beyond a reasonable doubt. *C.B.*, 61 Wn. App. at 282-83 ("Thus, depending on the type of case, the trier of fact must find that there is proof beyond a reasonable doubt, proof by clear, cogent and convincing evidence, or proof by a preponderance of the evidence. *McCormick*, at 956-64."). It is a test uniquely suited to the trier of fact since the trier of fact sees the witnesses, can watch their reactions, listen to them testify, and place all of the testimony and evidence in the context of the ongoing drama that is the trial of a lawsuit. *In re Estate of Lint*, 135 Wn.2d 518, 542, 957 P.2d 755 (1998). It is a task for which courts of review are unsuited since we have only the written record and cannot therefore pass on the credibility of witnesses and necessarily, then, the persuasiveness of the evidence produced during the trial. We do not see the parties or their witnesses testify. We do not see their facial expressions or those of their lawyers or listen to their intonations or do anything to help us pass on just how convincing—persuasive—they were.

¶70 The correct analysis would then limit our inquiry to something we are competent to do, that is pass on whether sufficient evidence was produced, *which if believed*, would then support facts that would, in turn, support the necessary legal conclusion, here "undue influence." Anything more requires that this court of review weigh the evidence, pass on the credibility of witnesses, and generally assume the function of the trier of fact who presided over the trial. Again, we do not have the institutional capacity to do that.

¶71 I then disagree with the statement (and necessarily the authorities supporting the statement) that "[w]hen a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting substantial evidence review." Majority at 301. Significantly, we do not pass on the persuasiveness of evidence to meet other burdens of persuasion—preponderance or beyond a reasonable doubt— even though the results of application of the beyond a reasonable doubt standard is frequently the loss of liberty. There is no analytical or historical justification for courts of review to decide how persuasive evidence in the superior court was, in this one single area of the law. Even an independent, constitutionally based review requires us to give due regard "to the trial judge's opportunity to observe the demeanor of the witnesses" and the trial court's determination as to credibility. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-500, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984); *State v. Read*, 163 Wn. App. 853, 864, 261 P.3d 207 (2011), *petition for review denied*, 173 Wn.2d 1021 (2012).

¶72 Here specifically, then, if left to my own devices, I would opt for an analytical approach that would limit us to passing on whether William or ultimately John met his *burden of production* when the record is reviewed in a light most favorable to the prevailing party—that is, reviewed for evidence that supports the court's findings. *See In re Estate of Bussler*, 160 Wn. App. 449, 465-66, 470, 247 P.3d 821

(2011) (deferring to the trial court's conclusion that daughter challenging will had not met her burden of persuasion because the trial court's conclusion was based upon unreviewable credibility determinations).

¶73 The challenger to a will must *produce* sufficient evidence to find facts that support the conclusion of undue influence (the only claim here is of undue influence). RCW 11.12.160(2). Indeed, if the showing is sufficient, a presumption of undue influence attaches:

> "[C]ertain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will . . . .
>
> "The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will. *In re Beck's Estate*, 79 Wash. 331, 140 Pac. 340 [(1914)]."

*Lint*, 135 Wn.2d at 535-36 (second alteration in original) (quoting *Dean v. Jordan*, 194 Wash. 661, 672-73, 79 P.2d 331 (1938)).

¶74 The trial judge here, sitting as the trier of fact, could have easily presumed, as a matter of law, that the will was the product of undue influence.

¶75 John Melter had a fiduciary or confidential relationship with Virginia Melter. At the time the May 2003 will was executed, John was Virginia's attorney-in-fact and Virginia had been living with John and his wife for nearly

seven months. John actively helped procure the May 2003 will. John wrote Steve Jolley directly to ask that he change Virginia's will. Ex. 31. The trial court could also have inferred that John also wrote Virginia's letter to Mr. Jolley. Like most of the letters written by John, Virginia's letter ends with "Thanks for your time." *Compare* Exs. 15, 32, *with* Exs. 32, 24. And, Virginia's letter to Mr. Jolley echoes John's complaints about William Melter's mismanagement of their parents' affairs that John e-mailed to William repeatedly. There are certainly inferences that could be drawn both ways from these facts. But I would leave those inferences to the trier of fact. *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992) (" 'A directed verdict or judgment [notwithstanding the verdict] is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party.' " (quoting *Indus. Indem. Co. of Nw., Inc. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990))).

¶76 John then received 99 percent of the estate's residue while William received nothing. This was a substantial change from Virginia's prior wills.

¶77 Other circumstantial evidence also supports the trial court's conclusion that John had undue influence over Virginia when she created her 2003 will. Virginia was aware of John's animosity toward William. John was controlling. The e-mails between John and William supported an inference that John was emotionally manipulative. The trial court could easily have inferred that Virginia executed the May 2003 will to appease John. Also, while the evidence shows Virginia was competent, she did not live with John and relinquish control over her financial affairs because she was in good health. She needed care for her everyday needs. She could not take care of herself. In sum, substantial evidence was produced to support findings that in turn support the conclusion that John exerted undue influence over Virginia when she executed her May 2003 will.

¶78 And the same conclusion might well follow on whether there was undue influence over Virginia when she made her inter vivos gifts to him. There is substantial evidence that John actively participated in the procurement of those gifts. At the time of the gifts, John was Virginia's attorney-in-fact and capable of setting up accounts in both of their names. The evidence suggests that he took Virginia to an attorney to have her sign an affidavit gifting him $5,000 each month. And, the evidence shows that large amounts of Virginia's cash ended up in accounts belonging to John alone or John and his wife. The testimony showed that Virginia did not want to handle her own money, so the trial court could easily have inferred that John did the leg work to execute Virginia's gifts to him. And, again, John received an unnaturally large share of Virginia's estate— virtually all of her cash. There was sufficient evidence for the trial court to find that John had undue influence over Virginia when she gifted him nearly her entire estate.

¶79 Ultimately, I would opt for an analysis that would defer to the trial judge's findings based on what evidence was *produced* rather than an analysis that requires us to evaluate the *persuasiveness* of that evidence. But that, unfortunately, is not the current status of the law and I will therefore sign on to the majority opinion.