FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 APR -9 AM 9: 23

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|                          |   |                        |
|--------------------------|---|------------------------|
| In re the Marriage of:   | ) | No. 76144-7-I          |
|                          | ) |                        |
| KEVAN HUSTON,            | ) | DIVISION ONE           |
|                          | ) |                        |
| Appellant,               | ) |                        |
|                          | ) |                        |
| and                      | ) |                        |
|                          | ) |                        |
| ANA HUSTON,              | ) | UNPUBLISHED            |
|                          | ) |                        |
| Respondent.              | ) | FILED: April 9, 2018   |
|                          | ) |                        |

Cox, J. — This is primarily a factual appeal by Kevan Huston ("Kevan"). He challenges the findings and conclusions of the trial court. Substantial evidence supports the findings and the findings support the conclusions, with one exception. That exception is the monthly net income figure that the trial court calculated on the child support worksheets. We cannot reconcile that figure with the information on Kevan's 2015 W-2 form that the trial court used for his child support obligation and other matters in this dissolution. Accordingly, we affirm in part, vacate in part, and remand with directions to address these apparent inconsistencies.

Kevan and Ana Huston met in late 2001.[1] They married two years later. At the time, Ana held a M.S. Degree in Nursing and worked in a family clinic in New York City. The couple had their first child, E., in 2005 and decided that Ana would leave her job to stay at home with E.

Over the next few years, they moved frequently for Kevan's work. After some time in San Francisco, Kevan accepted a position with Microsoft in the Seattle area in 2008. Four years later, the couple returned to New York so Kevan could take a position as vice president at his current employer, Evercore Partners. When he joined Evercore Partners, he received restricted stock units ("RSUs") to compensate him for stock options he lost by leaving Microsoft. In 2007, the couple had a second child, M.

That same year, the marriage began fracturing. The couple saw a couple's counselor for several months. Kevan would act aggressively at these sessions.

Kevan began abusing alcohol and other substances. His drinking markedly increased shortly after the move to San Francisco. Once in Washington, Kevan began experiencing anxiety, for which he was proscribed certain prescription drugs, including benzodiazepine. He became dependent on this drug. Back in New York City, Kevan drank more and began using cocaine in early 2013.

---

[1] For purposes of clarity, we use the first names of the parties in this decision.

By October 2012, Ana was pregnant with a third child, K. After Thanksgiving, Kevan perpetrated two acts of domestic violence involving Ana and, in December 2012, the couple separated.

Ana took the children and left to stay with family in Peru. Then, after a brief stay with Kevan's parents, she moved with the children to Woodinville, Washington. In June 2014, the couple purchased a house in Carnation, with a $20,000 gift of funds from Ana's mother to Ana for the down payment.

Kevan petitioned for dissolution of the marriage on March 25, 2015. He moved for temporary orders on June 24, 2015, seeking a temporary parenting plan and a temporary order for child support. The trial court commissioner entered the requested temporary orders, ordered an award of monthly maintenance to Ana for $3,500, and appointed Dr. Melanie English as parenting evaluator. On July 31, 2015, Kevan moved to revise the commissioner's ruling. He argued that the trial court should find Ana to be voluntarily underemployed and revise certain financial obligations imposed in the previous ruling.

In August 2015, Kevan e-mailed the trial court to request emergency relief. The trial court judge heard the matter by conference call and then, acknowledging that it had come "before the court in an unusual procedural posture," granted a specific August visitation schedule. Kevan failed to exercise his rights under this schedule.

Shortly after, the trial court entered an order on the motion to revise the commissioner's ruling. The new order granted in part and denied in part the

motion. It imputed income to Ana of $30 per hour. It upheld an earlier award of $5,000 in attorney fees imposed against Kevan.

Kevan moved to reconsider on August 28, 2015, asking that the trial court impute a higher income to Ana, and revise several financial obligations Kevan had been ordered to pay. The trial court largely denied that motion.

Trial was set for March 14, 2016, but Kevan moved to continue until late April. The trial court granted that motion. Trial then took place over seven days spanning the next two months.

The trial court prepared and entered its own findings of fact, decree, child support order, and parenting plan on September 14, 2016. The findings and conclusions are 34 pages long. On September 26, 2016, Kevan moved for reconsideration of these final orders. He argued that the trial court should reconsider its orders on maintenance, imposition of an attorney fee award, and its imputation of $30 hourly wages to Ana. The trial court denied that motion, except to amend the earlier finding to reflect that Kevan's wages had been garnished for child support.

Kevan appeals.

## DIVISION OF PROPERTY AND LIABILITIES

Kevan argues that the trial court abused its discretion by dividing the parties' assets and liabilities based on allegedly incorrect findings. We disagree.

RCW 26.09.080 requires that the trial court in a dissolution proceeding divide the parties' community and separate assets. The division must be "just and equitable" but not necessarily equal.[2]

The trial court must consider a non-exhaustive list of factors in making this division. These include the nature and extent of community and separate property, the marriage's duration, and the economic circumstances of the parties at the time of division, "including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time."[3] The trial court may also consider any party's concealment of assets.[4] It may not consider the parties' misconduct.[5]

This court reviews for abuse of discretion the trial court's division of assets and liabilities.[6] It does not reassess credibility.[7] Since the trial court weighed the evidence, this court's review is limited to determining if substantial evidence supports the trial court's findings of fact.[8] If so, this court then determines

---

[2] DewBerry v. George, 115 Wn. App. 351, 366, 62 P.3d 525 (2003).

[3] RCW 26.09.080(1)-(4).

[4] In re Marriage of Nicholson, 17 Wn. App. 110, 117, 561 P.2d 1116 (1977).

[5] RCW 26.09.080

[6] In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005).

[7] In re Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

[8] In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015).

whether the findings support the conclusions of law and the judgment.[9] Substantial evidence is a quantum of evidence "sufficient to persuade a fair-minded person of the truth of the declared premise."[10]

*Depletion of Fidelity IRA \*3958*

Kevan argues that the trial court abused its discretion by finding that he wasted $117,000 of community assets in the Fidelity IRA \*3958, contending that he spent these funds on community expenses. He argues that the trial court consequently abused its discretion by recapturing the amount of this account and allocating it to him in the division of assets. His argument ignores the trial court's actual findings.

At the date of separation in December 2012, the account carried a balance of $117,208. The trial court found that Kevan withdrew $9,991 from this account between June and September 2013, and $9,496 between December 2013 and March 2014. After that, the trial court found that Kevan withdrew $5,000 in March 2014. Between then and June 2014, the account was reduced by $90,530. Between March and April 2015, another $2,000 was withdrawn. The account was in Kevan's name.

The trial court associated these withdrawals with Kevan's extensive discretionary expenses. It noted credit card payments he made in 2014 exceeding $60,000 and a $10,000 payment he made to his girlfriend at the time of trial. It also noted that he had carried a "healthy balance in his accounts at all

---

[9] Id.

[10] Id.

6

times." The trial court further found that Kevan had not shown a financial need to justify the withdrawals that he made from this account.

The trial court did not abuse its discretion in recapturing $117,000 in this account and allocating the full $117, 208 value, as of the date of separation, to Kevan.

Kevan argues that he spent the relevant funds on community expenses. The record does not support this argument.

Kevan provides various explanations for these expenses on appeal. These explanations contradict the earlier explanation he gave in his motion for temporary orders, filed June 24, 2015. There, he alleged that he had spent the funds from his IRA on travel costs to see his children.

On appeal, Kevan claims that he paid $18,500 from this account for rent for their home in Tarrytown, NY. Not only were these payments made between December 2012 and April 2013, outside the relevant period of withdrawals, but Kevan cites to statements for the *3460 account, not the Fidelity IRA *3958.

Kevan also claims that he repaid Ana's mother $20,000 from this account on March 6, 2013. Not only is this outside the relevant period, but the record of this transaction shows only a customer withdrawal from the *3460 account.

Kevan alleges that he transferred $35,000 on April 9, 2013, from joint savings account *3460 to Ana's personal checking account to pay the children's tuition. Not only was this transfer made outside the relevant period but it did not implicate Fidelity IRA *3958.

Kevan alleges that he paid $32,562 as a down payment for the Carnation home on June 24, 2014. That payment was made from a Merrill Lynch Bank of America account *3445, not this IRA account.

Lastly, Kevan alleges that he paid $18,151.90 in private school tuition for the 2014 to 2015 school year. But these payments came from American Express accounts.

Kevan argues that the trial court contradicted itself in describing the depletion of this account. He points to the trial court's recognition that the balance of this account was $107,219 in December 2013 and $92,754 in March 2014. He argues that these findings contradict the trial court's finding that Kevan had spent $90,000 "of the funds in that account in the few months after [Ana] moved." But this finding referred to the Bank of America account *3460. Kevan makes similar contentions regarding a $50,000 withdrawal that conflate these two accounts. If these are the same account, Kevan has failed to prove it by citation to this record.

### Cash Payment to Ana

Kevan argues that the trial court abused its discretion by ignoring a $115,000 cash payment he made from his post-separation income as spousal support. We disagree.

Kevan argues that he paid $95,000 in regular payments of $5,000 from the *3460 account to the jointly held *7754 account. He cites Exhibit 8, which documents withdrawals but does not specify the destination or purpose of those withdrawals. He argues that these payments were reduced after he began

8

paying part of the Carnation home mortgage. After that point, the trial court found that Kevan paid $19,500 of spousal maintenance between December 2014 and May 2015, in monthly $3,250 amounts.

Kevan fails to demonstrate on this record that the trial court did not consider these payments. The trial court indeed made a finding as to the $3,250 payments. Kevan's argument suggests the trial court was obligated to find credible his testimony regarding the regular payments of $5,000. The trial court was not so obligated and this court does not reweigh the credibility of evidence.[11]

*Other Waste*

Kevan argues that the trial court abused its discretion by finding that he wasted community funds in credit card payments and personal discretionary expenditures. We again disagree.

Here, the trial court found that Kevan "went through $90,000 within the first few months after" the couple separated. The trial court also found that Kevan had made exceptional discretionary expenses.

Regarding food purchases, Kevan testified that he regularly has to buy meals for account representatives for work. But he testified that he paid for these transactions with a corporate American Express credit card, for which his company was liable. He fails to explain why he would nonetheless be personally liable for these payments.

---

[11] Melter, 167 Wn. App. at 301.

9

Kevan also testified to paying for dinners "with people at work" with his personal card in exchange for cash. But he did not testify that these were for business instead of some other social purpose.

Kevan further claims that the trial court lacked support in finding that he took a trip to St. Thomas. He cites generally to his Delta SkyMiles statements to show that the trip never took place, and alleges that he would have testified as much if asked. But he cites no evidence in the record to show that he did not take this trip, only that he did not collect Delta SkyMiles on it.

Kevan also provides no satisfactory reason for paying $10,000 to his girlfriend.

Thus, Kevan's challenge to the trial court's finding that he made wasteful discretionary purchases is unpersuasive.

### Equity in Carnation Residence

Kevan argues that the trial court abused its discretion by mischaracterizing $20,000 of equity in the Carnation residence as Ana's separate property, claiming it is community property. We conclude that the trial court properly determined the character of this property.

Washington law presumes assets acquired during marriage to be community property.[12] But "[t]his presumption is rebuttable by establishing that the acquisition fits within a separate property provision."[13]

---

[12] In re Marriage of Short, 125 Wn.2d 865, 870, 890 P.2d 12 (1995).

[13] Id.

RCW 26.16.140 contains such a provision, stating that "[w]hen spouses or domestic partners are living separate and apart, their respective earnings and accumulations shall be the separate property of each." This language contemplates a "defunct" marriage, rendered so "when both parties to the marriage no longer have the will to continue the marital relationship."[14]

Here, the trial court found that the couple was separated at the time they purchased the Carnation home. The parties put a $32,562 payment down on this purchase. Of this amount, the trial court identified $20,000 as a gift from Ana's mother solely for Ana's benefit. Ana's mother provided corroborating testimony. The trial court thus properly found this gift to be Ana's separate property.

Kevan argues that the funds from Ana's mother, once deposited in the joint account, became untraceable and thus lost their separate character. This argument is not persuasive.

When a party deposits separate funds in a shared account, such that "money in a single account cannot be apportioned to separate and community sources, the community property presumption will render the entire fund community property."[15] But the funds will retain their separate property character if "the sources of the deposits can be traced and apportioned, and the use of withdrawals for separate or community purposes can be identified."[16] In such

---

[14] Id. at 871.

[15] In re Marriage of Pearson-Maines, 70 Wn. App. 860, 866, 855 P.2d 1210 (1993).

[16] Id. at 867.

11

instance, "the funds are not so commingled that the account itself becomes community property."[17]

The trial court found that "[t]he fact that [the $20,000] was deposited in the joint account temporarily did not change the characterization or the intended purpose of Ms. Huston's mother." This is correct on the record before this court.

Kevan argues that these funds cannot be Ana's separate property because they were a loan. But he fails to explain why his characterization of these funds as a loan changes the result. The dispositive point is that they were separated when the funds were advanced to Ana solely for her benefit by her mother.

Kevan also contends that Ana's mother testified that Kevan repaid her for this loan. The record does not support this. Ana's mother testified that in March 2013, Kevan gave her $20,000 to repay "[o]ne of the loans." She did not specify that this "loan" was the gift towards the down payment.

The trial court did not abuse its discretion in making its decisions on the basis of the challenged findings, each of which is supported by substantial evidence.

Kevan does not challenge the justice or equity of the property division, only the underlying factual findings. He has thus failed to show that the trial court abused its discretion.

---

[17] Id.

## INCOME COMPUTATION

Kevan argues that the trial court miscalculated his income and, thus, miscalculated the burden that certain court-ordered financial obligations would put on him. We disagree, with one exception.

His argument focuses on his claimed 2016 and 2017 income. But the trial court never used income information from 2016 and 2017 in this 2016 trial. Rather, the court stated in its written findings that it used his 2015 W-2 form for the purposes of deciding his "child support obligation, division of assets and debts and spousal maintenance."[18]

The trial court calculated Kevan's gross monthly income in the child support schedule worksheets as $18,720. That is consistent with the use of his 2015 W-2, which states his yearly gross income as $224,640.30.

But we cannot reconcile the total income tax deduction of $3,390.83 set forth in the worksheet with the state and federal income tax and other deductions shown on his W-2 form. We accordingly requested at oral arguments that counsel provide supplemental briefing to clarify this discrepancy.

Our concerns are not resolved by this supplemental briefing. Because these deductions directly affect the monthly net income figure for calculation of his child support obligation, the trial court should address this issue on remand. We now vacate the child support order until the inconsistencies we have identified are resolved by the trial court.

---

[18] Clerk's Papers at 640.

Kevan also argues that the trial court calculated his income without appropriate consideration for the decreases his compensation will suffer as certain RSUs that Kevan received from Evercore Partners, upon leaving Microsoft and which will vest over time. But he cites as evidence the December 31, 2015 earnings statement which only references treasury stocks. Kevan cites no evidence on this record to show that the treasury stocks indicated in the earnings statement are identical to the RSUs referenced in the trial court's findings or Kevan's offer letter from Evercore Partners.

Kevan claims that the trial court ordered that he pay $7,111 for child support, childcare, private school tuition, and maintenance, all to be taken from his net income. The record does not support that allegation.

Here, the trial court deducted maintenance prior to arriving at its monthly net income calculation of $11,427. Kevan cites nothing in the record establishing the cost of private school tuition that he must pay.

Kevan also contends that several unquantified costs imposed by the trial court's orders "would exceed $2,000/month." These include a share of out-of-pocket medical expenses, extracurricular activities, and co-parenting counseling, as well as the full cost of hiring a case manager, a parenting supervisor, substance treatment and evaluation, and a CPA. But he cites no evidence to establish the cost of these obligations.

Kevan discusses within this section the $35,000 attorney fee award he must pay, which he calculates as a $3,000 monthly obligation. He argues that this calculation results from a division of the total award into monthly

contributions. Kevan cites no authority for the proposition that an attorney fee obligation should alter calculation of the other challenged obligations.[19] So we reject this argument.

Kevan argues that the trial court failed to account for his expense in flying back and forth across the United States to visit his children. This argument is unpersuasive.

Ana argues that Kevan's expenses are "special child rearing expenses" under RCW 26.19.080(3). Such expenses include "long-distance transportation costs to and from the parents for visitation purposes."[20] Such costs must be shared by the parents in the same proportion as the basic child support obligation.[21] And the trial court must consider the parents' ability to pay if the issue is raised before imposing such an obligation.[22]

But these expenses do not fit within that definition. They include Kevan's transportation costs, not the children's. Relatedly, they include the lodging and food costs that Kevan may choose to spend. Kevan's argument seems to be that these expenses, over which he has some discretionary control, should affect his other court obligations. But he cites no authority for that principle.[23]

---

[19] See Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 248, 350 P.3d 647 (2015); RAP 10.3(a)(6).

[20] RCW 26.19.080(3).

[21] Id.

[22] State ex rel. J.V.G. v. Van Guilder, 137 Wn. App. 417, 430, 154 P.3d 243 (2007).

[23] See Darkenwald, 183 Wn.2d at 248; RAP 10.3(a)(6).

## MAINTENANCE

Kevan argues that the trial court abused its discretion by awarding maintenance to Ana. We again disagree.

RCW 26.09.090(1) provides that the award must be "as the court deems just, without regard to misconduct, after considering all relevant factors." The statute provides a non-exhaustive list of such factors.

These factors include each party's financial needs and resources, which must include consideration of the division of property.[24] They also include the parties' standard of living during the marriage, the marriage's duration, and the party seeking maintenance's age, physical and emotional condition, and financial obligations.[25]

RCW 26.09.090(1)(b) also requires that the trial court consider the "time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances." In examining this factor, the trial court must consider the sacrifices and contributions one spouse has made so that the other could advance his education or career.[26] Such sacrifices include "career opportunities which the supporting spouse gave up in order to obtain sufficiently lucrative employment, or to move to the city where the student spouse wished to

---

[24] RCW 26.09.090(1)(a).

[25] RCW 26.09.090(1).

[26] Washburn v. Washburn, 101 Wn.2d 168, 180, 677 P.2d 152 (1984).

16

attend school."[27]  To compensate for these sacrifices, the trial court may award

maintenance allowing "the supporting spouse to share, temporarily, in the

lifestyle which he or she helped the student spouse to obtain."[28]

This court reviews for abuse of discretion a trial court's maintenance

award.[29]

Here, the trial court awarded Ana three years of maintenance at $3,000 a

month.  It did so after considering the RCW 26.09.090 factors.  For example, it

considered the nine and a half year duration of the marriage.

It considered the parties' employment, noting Ana's M.S. degree in

nursing as well as her relevant work experience.  But it also observed that Ana's

employment after she became a mother "ha[d] been sporadic, with periods of

unemployment and at most has been part-time."

That history had been interrupted in particular by the family's multiple

relocations, "brought on by Mr. Huston's change of jobs, and career

advancement."  The trial court found that "Mr. Huston has had the benefit of

career advancement while Ms. Huston had to re-start her employment each time

that the family relocated."  Ana had to reapply with each move for recertification,

repeatedly sacrificing professional networks and seniority.  "None of the

relocations were for the advancement of Ms. Huston's career."

---

[27] Id.

[28] Id. at 179.

[29] Id.

On this basis, the trial court found that Ana had a temporary need for maintenance in order to transition to self-sufficiency. It awarded maintenance accordingly. These findings are sufficient to support the maintenance award.

The trial court also took "into account the division of assets and other financial resources of the Wife." And it found that Kevan had the ability to pay, noting his lucrative employment, as elaborated in the Child Support Order.

Kevan argues that the trial court abused its discretion by improperly calculating Ana's imputed income. He is wrong.

RCW 26.19.071(6) guides the trial court's calculation of imputed income. Under that provision, the trial court imputes income to a voluntarily unemployed or voluntarily underemployed parent.[30] Ideally, the trial court imputes income based on the parent's actual documented earnings.[31] Absent such documentation, the court must impute income based on, in order of priority, full-time earnings at the parent's current rate of pay, full-time earnings at the parent's historical rate of pay if based on reliable information, or full-time earnings at a past rate, if information is incomplete.[32]

This court reviews for abuse of discretion a trial court's imputation of income.[33]

---

[30] RCW 26.19.071(6)

[31] Id.

[32] RCW 26.19.071(6)(a)-(c).

[33] In re Marriage of Shui and Rose, 132 Wn. App. 568, 588, 125 P.3d 180 (2005).

Here, the trial court imputed Ana's hourly wage at $30 for 40 hours a week. In doing so, it found that she was voluntarily underemployed. Although Ana's undisputed current wage is $60 per hour, the trial court found this did not reflect "reliable information for full time pay in Ana Huston's position."[34]

The trial court "further did not find that imputing full time pay to Ms. Huston based on the higher rate of pay that she receives as a part-time nurse, who does not receive full benefits, would be proper." Accordingly, the trial court used the hourly rate Ana proposed. It calculated her full-time wage at $30 per hour, equivalent to a net monthly income of $6,589.91.

These findings are substantiated by Ana's testimony at trial. Ana explained that absent exceptional experience, she would not receive a full-time hourly wage commensurate with her current part-time hourly wage. She only received the higher wage for part-time work because her employer was not paying for benefits, continuing medical education, or conference travel.

Because the trial court had evidence of Ana's actual earnings, it did not have to reconstruct her full-time earnings. It heard testimony regarding Ana's current wages as well as evidence on the payment practices for employers of nurse practitioners in Ana's position, and reached the imputed income of $30 per hour for 40 hours a week. This was not an abuse of discretion.

Kevan argues that the trial court abused its discretion in ordering this award because Ana provided "almost no supporting LFLR10 documents."

---

[34] (Emphasis omitted.)

Elsewhere, he contends that she provided one binder of account statements compared to his eight. This argument is unpersuasive.

RCW 26.19.071 requires disclosure and consideration of each parent's income and resources, documented in appropriate financial records. This court does not reweigh such evidence.[35]

Here, Ana provided financial records demonstrating her income and resources. Kevan's contention that these were not sufficiently extensive improperly asks this court to reweigh the evidentiary value of Ana's disclosure.

## CHILD SUPPORT

Kevan argues that the trial court abused its discretion in ordering him to pay his children's private school tuition for the 2016 to 2017 school year as a special child support obligation. We disagree.

Under RCW 26.19.080(3), private school tuition is a "special child rearing expense[]" not included in the basic child support calculation. The trial court has discretion to determine the "necessity for and reasonableness of" such required expenses.[36]

This court has previously "held that a noncustodial parent should not be obligated to pay for private school when acceptable public schools are available unless there is a 'showing of special circumstances justifying the need for private

---

[35] RCW 26.19.071(1).

[36] RCW 26.19.080(4).

20

school education.'"[37] Such circumstances illustratively include, under In re Marriage of Stern, "family tradition, religion, and past attendance at a private school."[38] The trial court must also make findings on the non-custodial parent's ability to pay when the issue is raised.[39]

This court reviews for abuse of discretion a trial court's child support determination.[40]

Here, the trial court found in the final parenting plan that:

The children have been attending the Three Cedars Waldorf School for the past years [sic]. In order to provide some level of stability for the children during the transitional time, the Court finds that it is in the best interest of the children to attend the Three Cedars Waldorf School for the 2016-2017 school year. The mother shall apply any financial assistance that the school provides to the total amount due and the remainder of the tuition shall be divided 50/50 between the parents.[41]

This finding was sufficient to support the order that Kevan pay the private school tuition. The trial court identified a proper special circumstance, namely the children's past attendance and need for stability. And the trial court made extensive findings on Kevan's ability to pay in its child support order.

---

[37] Van Guilder, 137 Wn. App. at 428 (quoting In re Marriage of Stern, 57 Wn. App. 707, 720, 789 P.2d 807 (1990)).

[38] 57 Wn. App. 707, 720, 789 P.2d 807 (1990).

[39] Van Guilder, 137 Wn. App. at 430.

[40] Id. at 423.

[41] Clerk's Papers at 617.

## PARENTING RESTRICTIONS

Kevan argues that the trial court abused its discretion in restricting his visitation time and decision-making authority based on finding that he engaged in a history of domestic violence, and abused alcohol and other substances. We disagree.

### Domestic Violence

Kevan argues that the trial court abused its discretion by finding that he engaged in a history of domestic violence sufficient to justify parenting restrictions under RCW 26.09.191. The history of domestic violence is well documented in this record.

RCW 26.09.191(1) and (2) require that a trial court restrict a parent's residential time and decision-making authority if the parent has engaged in "a history of acts of domestic violence . . . or an assault or sexual assault that causes grievous bodily harm or the fear of such harm." RCW 26.50.010(3) defines domestic violence for these purposes to include "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members." This court has previously examined the legislative history behind these provisions to indicate that a "history of domestic violence" must go beyond "'isolated, de minimis incidents.'"[42]

---

[42] In re Marriage of C.M.C., 87 Wn. App. 84, 88, 940 P.2d 669 (1997) (quoting 1987 Proposed Parenting Act, Replacing the concept of child custody, Commentary and Text 29 (1987)).

This court reviews for abuse of discretion a trial court's parenting plan restrictions.[43] This court does not reassess credibility in considering the findings that support such decisions.[44]

Here, the trial court found that Kevan committed two acts of domestic violence against Ana while she was pregnant near the end of 2012. The trial court found as follows:

> 1) [W]hen Mr. Huston came home late at night; knocked over and broke a glass in the girls' bedroom; became angry and loud; yelling at [Ana], using profanities, and telling her not to help in clean-up. She testified that he was drunk and that the incident woke up the girls who were asleep; and 2) a following incident when Mr. Huston came home late at night and during an argument pushed Ms. Huston and then pinned her against a dresser drawer. Ms. Huston testified that Mr. Huston was drunk on this occasion as well and that she could smell alcohol on him on both occasions.[45]

The trial court further found that, based on these incidents, Ana "feared for her life and safety and that of their children." Kevan gave conflicting testimony but the trial court found Ana to be more credible.

These findings support a mandatory restriction under RCW 26.09.191. Each incident constitutes domestic violence. In the first instance, Kevan caused Ana to fear physical harm. In the second, Kevan caused Ana actual physical harm by assaulting her. Together these incidents constitute a history of domestic violence.

---

[43] Id. at 86.

[44] Melter, 167 Wn. App. at 301.

[45] Clerk's Papers at 660.

23

Kevan argues that the trial court found the occurrence of domestic violence based on "'mere accusation[].'"[46] This is not accurate. The trial court heard testimony, assessed credibility, and reached a finding supported by the evidence.

The rest of Kevan's argument consists of attacking Ana's credibility based on alleged inconsistencies and Dr. English's report, as well as on downplaying the severity of the first incident of domestic violence. This court does not reassess credibility.[47]

*Alcohol and Substance Abuse*

Kevan argues that the trial court abused its discretion by finding that he suffers from alcohol and substance abuse sufficient to justify parenting restrictions under RCW 26.09.191(3)(c). These are also well documented in this record.

RCW 26.09.191(3)(c) allows a trial court the discretion to restrict a parent's rights in a parenting plan based on "[a] long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions."

RCW 26.09.004(2) defines parenting functions as "those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child." Those aspects include

---

[46] Appellant's Opening Brief at 54 (quoting In re Marriage of Caven, 136 Wn.2d 800, 809, 966 P.2d 1247 (1998)).

[47] Melter, 167 Wn. App. at 301.

24

maintaining a loving and stable relationship, attending to the child's daily needs, attending to the child's education, assisting the child in building appropriate relationships, exercising judgment regarding the child's welfare, and financially supporting the child.[48]

This court reviews for abuse of discretion a trial court's restrictions in a parenting plan.[49]

Here, the trial court found "that there is compelling evidence that Mr. Huston has a long term drinking problem." It based these findings on testimony from the parties, other witnesses, and parenting evaluator Dr. English.

Ana testified that Kevan was drunk during both episodes of domestic violence noted by the trial court. In fact, she testified, Kevan came home drunk most nights. Kevan acknowledged that he had struggled with alcohol after the separation. Ana testified that several times Kevan smelled of alcohol when he arrived from New York to visit the children.

Kevan briefly sought treatment at the Hazelden Betty Ford Clinic in New York, attending 24 of 32 required sessions. His treatment provider there reported that he "met the criteria for alcohol and cocaine dependence." He left, allegedly because he was unable to balance work hours and session schedule, and did so "*against staff and medical advice.*"

But the trial court noted that his work hours did not stop Kevan from socializing after work. Much of this socializing took place at establishments that

---

[48] RCW 26.09.004(2).

[49] In re Marriage of C.M.C., 87 Wn. App. at 86.

serve alcohol, including at least one brewery. The trial court noted a payment from Kevan's account for the purchase of beer on three occasions in New York City.

For this and related reasons, the trial court found that Kevan's "testimony as to being able to control his drinking is unsupported by his actions." The trial court similarly found that Kevan's testimony on these issues was "minimizing."

The trial court also found that Kevan abused drugs, including prescription drugs and cocaine.

Based on this evidence, the court expressed concern that Kevan's alcohol and other substance usage "placed the children at risk of physical, emotional and mental harm and has interfered with the performance of his parenting functions."

The trial court ordered that Kevan could only visit his children after completing an alcohol and substance abuse assessment and, if recommended, a treatment program. And it further ordered Kevan not to consume alcohol or substances, including prescription drugs, within the 12 hours prior to any visit with the children.

Kevan argues that the trial court abused its discretion by rejecting Dr. English's report and the negative hair follicle test. This argument is unpersuasive.

Dr. English's report was filed under seal. Based on our review of the contents of that report, we conclude that the trial court did not abuse its discretion by determining that RCW 26.09.191 restrictions were appropriate, notwithstanding Dr. English's recommendation.

Kevan argues that the trial court abused its discretion by citing his delay in complying with a request for a hair follicle test when the e-mail containing this request was excluded as hearsay. This court need not resolve this issue.

Here, the negative hair follicle test appears as exhibit 29. The trial court made extensive further findings showing Kevan's alcohol and substance use outside the five-month period tested. The trial court's findings were sufficient to support the restrictions placed, without any necessary regard to the hair follicle test.

Kevan also contends that the trial court misconstrued certain transaction records to suggest that he bought alcohol to drink, when he did not. This argument is unpersuasive in light of this court's standard of review.

Here, upon reviewing Kevan's American Express *2007 statement, the trial court found transactions for "General alcohol." It also found that Kevan purchased beer from Schumer Liquors in New York City on three occasions from account *2007. Kevan argues that he purchased wine on the way to a friend's picnic and the beer transactions were for gifts to colleagues. He presents no evidence in support other than his own testimony, the credibility of which we do not review.

Kevan argues that the trial court abused its discretion in finding that he had problems with alcohol and substance abuse based on evidence from 2014 and before. Because he cites no authority for the proposition that such consideration is an abuse of this discretion, his argument is unpersuasive.[50]

---

[50] See Darkenwald, 183 Wn.2d at 248; RAP 10.3(a)(6).

27

Kevan lastly argues that "while any reasonable person might have some concern regarding my relationship with alcohol . . . no reasonable person could conclude that I have an ongoing issue with alcohol warranting restrictions on my parenting." This argument lacks merit.

Here, the trial court found cause for concern that Kevan's alcohol and substance abuse would affect his ability to properly parent. The instability of such abuse caused in his own life justifies concern regarding Kevan's ability to provide the children stability or to exercise proper judgment for their welfare. For example, he consumed alcohol before perpetrating the two acts of domestic violence. And Kevan purchased alcohol while driving with his daughters. The trial court thus did not abuse its discretion by imposing these parenting restrictions.

### ATTORNEY FEES

#### *At Trial*

Kevan argues that the trial court abused its discretion by awarding $30,000 in attorney fees based on his intransigence below. We disagree.

A trial court may order one party to pay another's attorney fees based on statute, contract, or equity.[51] A party's intransigence is an equitable basis to support such an award.[52]

"Determining intransigence is necessarily factual, but may involve foot-dragging, obstructing, filing unnecessary or frivolous motions, refusing to

---

[51] Berryman v. Metcalf, 177 Wn. App. 644, 656, 312 P.3d 745 (2013).

[52] Wixom v. Wixom, 190 Wn. App. 719, 725, 360 P.3d 960 (2015).

28

cooperate with the opposing party, noncompliance with discovery requests, and any other conduct that makes the proceeding unduly difficult or costly."[53] If the trial court determines that a party has demonstrated intransigence, the financial status of the party seeking the award is irrelevant.[54]

This court reviews for abuse of discretion a trial court's order of attorney fees based on intransigence.[55]

Here, the trial court found that Kevan had acted intransigently by filing excessive motions, failing to pay court ordered fees, "not providing a clean picture of the financial records," using abusive tactics against Ana during the pendency of the matter, and obscuring his continued alcohol usage.

*Excessive Motions*

Kevan argues that the trial court abused its discretion in finding that he acted litigiously by filing excessive motions. This argument is unpersuasive.

Kevan filed several motions over the course of litigation. These include a motion for temporary orders filed June 24, 2015; motion to revise commissioner's ruling filed July 31, 2015; emergency motion by e-mail letter in or around August, 2015; motion to reconsider filed August 28, 2015; motion for continuance filed March 14, 2016; and motion for reconsideration of final orders filed September 26, 2016. Kevan does not dispute that he filed these motions.

---

[53] Id.

[54] Mattson v. Mattson, 95 Wn. App. 592, 604, 976 P.2d 157 (1999).

[55] Wixom, 190 Wn. App at 725.

The record contains substantial evidence to support the trial court's finding that Kevan filed motions to an extent that the trial court could reasonably characterize as excessive. Kevan provides no authority to require the trial court find a specific severity of excessive filing.[56] He only argues that his motions were justified. But even if his earlier motions were not improper, the trial court has discretion to find intransigence based on "any other conduct that makes the proceeding unduly difficult or costly."[57]

### Financial Disclosure

Kevan argues that the trial court abused its discretion by finding that he failed to transparently disclose his finances. This too is unpersuasive.

A party in a dissolution proceeding acts intransigently when he provides incomplete or "conflicting information about his income" and by such conduct, forces the other party to conduct intense and expensive discovery.[58]

King County Local Family Law Rule 10(b)(4) requires that each party provide "[a]ll statements related to accounts in financial institutions in which the parties have or had an interest during the last six (6) months."

The trial court found numerous deficiencies with the financial disclosures Kevan provided.

The trial court observed that the couple's joint Bank of America account *3460 showed a *"very complicated transaction history."* It noted that Kevan

---

[56] See Darkenwald, 183 Wn.2d at 248; RAP 10.3(a)(6).

[57] Wixom, 190 Wn. App at 725.

[58] Mattson, 95 Wn. App. at 605.

withdrew $50,000 by check #2169 but failed to identify where these funds were deposited. It further noted withdrawal of roughly $20,000 paid towards Kevan's credit cards.

The trial court identified deposits in this account from a PayPal account, but found that "a PayPal account has not been disclosed and records were not submitted." Kevan argues that records could not exist because PayPal is only a processor. But the trial court did not discuss PayPal as a depository account. It discussed it as a channel for deposits into account *3460, that potentially recorded the source of those deposits. This is consistent with PayPal's characterization as a processor.

Summarizing its review of this account, the trial court found "a high level of expenditures by Mr. Huston without proper explanation." It observed that he had withdrawn $90,000 "within the first few months" after the couple separated without any apparent connection to the actual separation.

The trial court initially found discrepancies with Kevan's Bank of America account *6611, opened with funds from joint account *3460. It observed that Kevan's direct deposits of income into this account fell by almost half in November 2015 without explanation. The trial court inferred that Kevan must have deposited the rest of his income in some undisclosed account. The trial court held that by failing to provide statements after November, 2015, Kevan had failed to "submit[] a full and complete financial records [sic]."

The trial court amended its finding on reconsideration to find that Kevan's income had diminished because it was garnished for child support obligations.

31

But it concluded that this amendment did not change the other findings, conclusions, and orders.

The trial court discussed at length the rollover IRA in Fidelity account *3958. This asset, although in Kevan's name, was owned by the community. The trial court identified several withdrawals made by Kevan. For example, between March 2014 and June 2014, the statement balance fell from $92,754 to $2,224. By April of the next year, the balance was at $224. The court found that Kevan withdrew virtually the entire balance of this account, in connection with his substantial credit card payments and other expenditures.

The trial court found that several monthly statements were missing from this account. Kevan alleges that he did not submit the alleged monthly statements because Fidelity only provided quarterly statements. He testified that statements were only provided for the last month of the quarter, and the statements provided are spaced roughly a quarter of the year apart from one another.

But evidence also exists to support the finding that these were monthly statements. Notably, each statement provides in the upper right corner the date range to which it applies. The range for each statement is a month long. On this basis, substantial evidence supports the finding that these were monthly statements and thus the record provided was incomplete. The trial court did not have to accept Kevan's characterization.

The trial court considered together Kevan's various American Express credit card accounts, *5006, *6004, *1005, *2003, *3001, *5006, *2007, *1009,

32

and *7002. The court identified several payments into these accounts from sources that do not appear in the documentation.

The trial court describes a "phantom account" with JP Morgan Stanley, from which several monthly deposits were made. Kevan argued in his motion for reconsideration that when the RSUs granted by his employer vested, the proceeds were deposited into this account and then transferred to Bank of America account *6611. But in resolving that motion, the trial court found that Kevan's testimony and corroborating documents showed initial deposit of proceeds into Merrill Lynch account *1859, from whence funds were deposited into Bank of America account *3460. Regardless, "[t]he Court did not include the monthly deposits as income to Mr. Huston for the purpose of child support calculation."

The evidence in this record was "sufficient to persuade a fair-minded person of the truth of" the trial court's finding that Kevan was not transparent in his financial disclosures, and thus acted intransigently.[59]

Kevan argues at length that the trial court unfairly ignored Ana's alleged failure to comply with LFLR 10. But he provides no authority why Ana's failure is relevant to whether he acted intransigently.[60]

*Payment of Court Ordered Fees*

Kevan argues that the trial court abused its discretion by finding that he had failed to pay court ordered fees. We disagree.

---

[59] H.N., 188 Wn. App. at 762.

[60] See Darkenwald, 183 Wn.2d at 248; RAP 10.3(a)(6).

Here, the trial court based its finding of intransigence in part on Kevan's "non-payment of the previously ordered amounts ($5,000 attorney's fees on 7/22/15, and non-payment of his pro-rata share of childcare and out of pocket medical and other expenses)." The trial court found that "while [Kevan] lived a high expense life style, as evidenced by his consumer charges on his credit cards and his bank statements, he continued to ignore the Court's order requiring him to pay attorney's fees to the Wife's attorney."

Kevan argues that he long lacked the funds to pay those fees, and that he paid them to the extent he was able once he received his bonus. But the trial court found that Kevan had not shown a basis for financial need that would justify non-payment, "and his financial records d[id] not support such claim either."

Kevan testified on April 27, 2016, that he had paid his pro rata share of childcare as well as the children's medical and school expenses to Ana a week before trial. He did so after delaying for several months. And Kevan fails to show in this record any evidence that he has paid any portion of the ordered attorney fees.

The trial court found that Kevan had been intransigent in paying ordered fees. And the record indicates that Kevan has continued not to pay the ordered attorney fees. Substantial evidence thus supports the trial court's finding in this regard.

*Abusive Tactics*

The trial court found that Kevan made abusive use of conflict by forwarding an e-mail that Kevan's girlfriend wrote to Ana. Kevan does not

34

appear to address this issue and as such, it can be accepted as a verity on appeal, justifying the finding of intransigence.[61]

*Alcohol Usage*

The trial court also found that Kevan acted intransigently by failing to be candid about his ongoing alcohol usage and by providing a hair follicle sample several months after this issue arose. Kevan does not directly address this basis for the finding of intransigence but discusses it in relation to his general alcohol usage.

The trial court found that the record repeatedly indicated purchases of alcohol that Kevan denied. This finding is supported in the record by evidence that Kevan frequently socialized at restaurants serving alcohol, including at least one brewery. The trial court also noted three payments Kevan made for beer in New York City. Kevan alleges on appeal that these transactions were for gifts of vodka to colleagues. The trial court also found upon reviewing Kevan's American Express *2007 statement transactions for "General alcohol." Kevan alleges that he purchased wine on the way to a friend's picnic. Kevan cites no evidence to substantiate his explanations of these transactions. Based on this record, and Kevan's denials, the trial court did not abuse its discretion by finding that he was not candid regarding alcohol use.

Kevan argues that the trial court abused its discretion by relying on the delay in submitting the hair follicle test. At trial Dr. English was asked about an e-mail dated May 20, 2015, acknowledging that Ana had requested Kevan

---

[61] Schroeder v. Haberthur, 200 Wn. App. 167, 172, 401 P.3d 319 (2017).

undergo an alcohol evaluation. But the trial court ruled that the e-mail was inadmissible as it lacked foundation.

Thus, the trial court admitted no evidence to demonstrate that Ana requested Kevan undergo a hair follicle test and that Kevan was intransigent in complying. But it had sufficient other evidence from transactional records to support its finding.

*On Appeal*

Ana seeks an award of her attorney fees on characterizing Kevan's appeal as frivolous and intransigent. Neither basis is supported in this record, and we deny her request for fees on appeal.

An appeal is frivolous if there are no debatable issues upon which reasonable minds might differ and it is so totally devoid of merit that there is no reasonable possibility of reversal.[62] All doubts as to whether the appeal is frivolous should be resolved in favor of the appellant.[63] Given that we vacate in part, it cannot be said that there are no debatable issues in this case. Thus, Kevan's appeal is not frivolous.

The other basis is intransigence on appeal.[64] But Kevan has not continued to act intransigently or in an excessively litigious manner on appeal as he did below. This record does not support an award of fees on this basis.

---

[62] Kinney v. Cook, 150 Wn. App. 187, 195, 208 P.3d 1 (2009).

[63] Id.

[64] Eide v. Eide, 1 Wn. App. 440, 445-46, 462 P.2d 562 (1969).

Kevan additionally requests attorney fees in his Brief in Response to Respondent's Motion to Allow Supplemental Briefing and Supplemental Evidence. He contends that Ana's counsel has advanced "fallacious and bad faith argumentation" throughout this appeal. We hold that neither the record nor briefing show such argumentation as would justify a fee award. We thus deny Kevan's fee request as well.

We affirm in part, vacate in part, and remand with instructions. We deny the request for an award of appellate attorney fees to Ana Huston.

_Cox, J._

WE CONCUR:

_Mann, A.C.J._          _Becker, J._